In re Hugh D. REED and Sharon Marcus Reed, Debtors.

FIRST TEXAS SAVINGS ASSOCIATION, INC., Plaintiff,

v.

Hugh D. REED and Sharon Marcus Reed, Defendants.

TEXAS BANK AND TRUST COMPANY and Small Business Administration, Plaintiffs,

v.

Hugh D. REED and Sharon Marcus Reed, Defendants.

Jack P. DRISKILL, Trustee, Plaintiff,

v.

Hugh D. REED and Sharon Marcus Reed, Defendants.

Bankruptcy No. 579–00106.
Adv. Nos. 580–0018, 580–0019 and 580–0025.

United States Bankruptcy Court,
N. D. Texas,
Lubbock Division.

June 12, 1981.

Jack McClendon, Lubbock, Tex., for debtors.

George McCleskey, Lubbock, Tex., for plaintiff First Texas Savings Association.

R. Byrn Bass, Jr., Barbara K. Hoffman, Small Business Administration, Lubbock, Tex., for plaintiffs Texas Bank and Trust Company and Small Business Administration.

Jack P. Driskill, Lubbock, Tex., for plaintiff Jack P. Driskill, trustee.

## MEMORANDUM AND ORDER

BILL H. BRISTER, Bankruptcy Judge.

First Texas Savings Association, Inc. ("First Texas"), Texas Bank and Trust Company ("Bank"), Small Business Administration ("SBA"), and Jack P. Driskill, Trustee ("Trustee"), each filed complaint to deny discharge to Hugh D. Reed and Sharon Marcus Reed. Each complaint alleged that the debtors had, within one year before the date of filing the petition in bankruptcy, transferred, removed, or concealed property of the estate with intent to hinder, delay or defraud a creditor or the trustee as denounced by 11 U.S.C. § 727(a)(2), that the debtors concealed, destroyed, mutilated, falsified, or failed to keep and preserve books and records from which their financial condition and business transactions might be ascertained within the meaning of § 727(a)(3), and that debtors failed to explain satisfactorily losses or deficiencies of assets to meet their liabilities within the meaning of § 727(a)(5). The same transactions were alleged by each creditor in support of his respective complaint to deny discharge.[1] Therefore the complaints were consolidated for nonjury trial which commenced on March 9, 1981, and which was completed on April 29, 1981. The following factual summary constitutes the findings of fact contemplated by Rules of Bankruptcy Procedure, Rule 752.

Hugh D. Reed had opened Reed's Men's Wear, a proprietorship, in Lubbock, Texas, in about March 1977. He financed the operation in part with a loan in the sum of $150,000.00 from Texas Bank and Trust Company, the loan being guaranteed by Small Business Administration. After the store had been in operation for approximately three months Reed realized that the store was undercapitalized. He returned to the bank, seeking additional monies. He was afforded a $50,000.00 line of credit by the bank, and SBA subordinated its guaranteed loan to that line of credit.

At all times germane to this memorandum Reed (or his hereinafter mentioned personal corporation) was employed as a sales representative for Scully Leathers ("Scully"). In the first year of his store's operation in 1977 he worked in the store (Reed's Men's Wear) approximately 75% of the time and traveled for Scully approximately 25% of the time. The records for the close of the year in 1977 showed that the business operation was profitable.

---

1. Additionally, SBA and the Bank have filed complaint to determine dischargeability of their particular debt pursuant to 11 U.S.C. § 523(a)(2)(B), based on their allegation of a materially false financial statement having been furnished to them, and on other bases. Trial of the § 523 issue was deferred, pending outcome of the attack on discharge in these consolidated proceedings.

In 1978 he worked in the store 50% of the time and traveled for Scully 50% of the time. The end of the year statement for 1978 reflected that the operation was not profitable.

In 1979 he worked in the store 40% of the time, traveled for Scully 60% of the time, and ended the year by filing the petition in bankruptcy on December 21, 1979.

Reed's earnings as sales representative for Scully were significant. In December 1978 his accountant advised him to set up a corporation in order that a tax advantage might be enjoyed. Reed caused Reyata Corporation ("Reyata") to be incorporated. Reyata was then placed on the Scully payroll for the receipt of commissions from sales produced by Reed, and Reed, in turn, was paid a salary by Reyata. In 1979, the year the bankruptcy petition was filed, the commissions from Scully to Reyata totalled $180,000.00, or $15,000.00 per month.

By February 1979, it was apparent to Reed that the business was insolvent. Reed met with the major trades creditors, with the bank, and with SBA officials, and entered into an agreement for operation of the business by a consultant. The major creditors agreed to suspend all collection efforts on their existing debts upon the promise by Reed to commence payments to them on those debts in January 1980.

The operation by the consultant did not cure the financial woes of Reed's Men's Wear. On December 15, 1979, Reed entered into an agreement with the bank and SBA to turn the store over to them and on December 21, 1979, Hugh D. Reed and Sharon Marcus Reed filed petition for order for relief under Chapter 7 of Title 11, United States Code.

The consolidated plaintiffs have detailed a number of challenges to discharge. They claim that Reed started planning the bankruptcy in February 1979, ten months before the petition was filed. They point to the fact that in February 1979 he had persuaded the major creditors to place their respective accounts in suspense until January 1980, when commencement of payments was promised. They produced evidence of an $11,000.00 note which Reyata Corporation had executed for the benefit of Reed, personally, but which was repaid to Bank of the West shortly before bankruptcy with monies from the Reed's Men's Wear bank account. They were suspicious of the fact Reed, two months before bankruptcy, had opened a new bank account at Bank of the West, without the knowledge or consent of the officials of Texas Bank and of SBA, and from that date until the store was closed in mid December 1979 the debtors had deposited the daily store receipts in that unsupervised account. They attributed a fraudulent purpose to the fact that Reed had caused his employer, Scully Leathers, to prepay a $15,000.00 commissions check in November 1979, one month prior to the filing of the bankruptcy petition, when that commission check was not due until January 1980.

Each of those claimed malfeasances is some evidence which will support a conclusion that the debtors were planning to file the bankruptcy petition. Each of those acts can be evidentiary of a scheme and design on the part of the debtors to hinder, delay or defraud their creditors. However, the primary purpose of the bankruptcy law is to afford debtors a new opportunity in life and a clear field for future efforts, unhampered by the pressure and discouragement of preexisting debts. *Local Loan Company v. Hunt*, 292 U.S. 234, 244, 54 S.Ct. 695, 699, 78 L.Ed. 1230 (1934). That concept of a "fresh start" is embodied in the Bankruptcy Code and is consistently expressed in the cases construing its diverse provisions. In order that effect may be given to the "fresh start" notion, the provisions of § 727(a) relating to discharge must be liberally construed in favor of the debtors. Any objection to discharge must be based on one or more of the nine specified conditions of § 727(a)—a general charge of dishonest conduct does not suffice. Therefore, the claimed infractions above mentioned, without more, present no bases for denial of discharge.

In this case, however, "more" exists.

The plaintiffs have raised two additional tangible objections—the conversion of non-exempt assets to exempt assets and the failure of the debtors to account for approximately $19,500.00 in cash.[2]

## CONVERSION OF NONEXEMPT ASSETS TO EXEMPT ASSETS

The law is unsettled in the area which produces the first of those tangible objections.

The evidence established that Hugh D. Reed had a gun collection which he had valued on an April 1, 1979, financial statement at $20,000.00. He sold that collection to a friend, Steve Gallagher, on December 11, 1979, ten days prior to filing the petition in bankruptcy, for $5,000.00 cash.

On the same April 1, 1979, financial statement Reed had listed an antique collection as having value of $3,000.00. Three months later, in August, 1979, he purchased additional antiques from an estate for $11,000.00. In late November, 1979, he sold three items from the antique collection to an acquaintance, Charles Tharpe, for $3,500.00 and sold the remaining antiques on December 11, 1979, to the friend, Steve Gallagher, for $5,000.00 cash.

In November, 1979, approximately one month prior to the commencement of the bankruptcy proceedings, Reed had purchased a one-third interest in a business enterprise, known as Triple BS Corporation, for the sum of $15,000.00. He sold that interest in the business to the same friend, Steve Gallagher, on December 11, 1979, for $5,000.00 cash.

In three separate transactions between October 5, 1979, and November 13, 1979, Reed had purchased gold coins—Kruger-rands and Mexican 50 Peso pieces—for the total sum of $22,115.00. On or about December 10, 1979, he sold those coins for $19,500.00 cash.

The amount received for the gold coins approximated market value on the date of their sale. The amount for which Reed sold the gun collection, the antiques, and the interest in the business to his friend, Steve Gallagher, was approximately one-third of the apparent value. However, aside from the fact that they proved that the debtor had listed the gun collection and some of the antiques on the April 1, 1979, financial statement as having value of $20,000.00 and $3,000.00 respectively, and the fact that he purchased the remaining antiques four months prior to bankruptcy for the sum of $11,000.00 and the business interest one month before bankruptcy for $15,000.00, plaintiffs adduced no evidence of actual value of those nonexempt items.

Fourteen months prior to the time the petition in bankruptcy was filed the debtors had obtained a $20,000.00 improvement loan from State Savings and Loan Association for the construction of a sun-deck room, swimming pool, and other pool facilities at their residence. On December 13, 1979, two or three days after he had received the proceeds of sale of nonexempt items, Reed took $19,892.00 from those proceeds of sale of the mentioned nonexempt assets and paid off the improvement loan on the residence. The balance of approximately $15,000.00 was applied by Reed towards the vendor's lien note against the residence, reducing the balance of that note to $28,000.00, more or less. The effect of the transactions was to convert nonexempt assets to exempt real estate.

**2.** A third challenge attacking the record keeping practices of the debtors, failed to materialize. Reed kept no books or records for Reyata Corporation, but Reyata Corporation was quite obviously the *alter ego* of Hugh D. Reed. It is not necessary to discuss the elements for "piercing the corporate veil", because the device in this case never rose to the dignity of a veil. The only attack made on the business records of Reed's Men's Wear was the absence of a daily summary of receipts and disbursements for the period from December 1, 1979 until the store was closed approximately two weeks later. However, the sales tickets, the cash tickets, and other documentation upon which the daily summary was based were in existence and were available to the consolidated plaintiffs. Therefore, excepting only the lack of records concerning the $19,500.00 "unaccounted for" cash, the general attack on the debtors' records is without merit.

The trustee and the creditors were understandably upset when the flagrant prebankruptcy or exemption planning came to light. The debtors had an answer for them, however.

As far as the sale of the nonexempt assets for less than a reasonably equivalent value was concerned, Hugh D. Reed testified that the amount which he received for those nonexempt items was in reality no concern to the consolidated plaintiffs, because had he received more money for those assets he would have applied those additional monies in the same manner to the liens against the homestead. He was quite candid in his assertion that regardless of the amount of money which he might have received for those nonexempt assets there was not going to be anything there for the creditors. Moreover he did not concede that he had received less than a reasonably equivalent value for the nonexempt assets and tendered the deposition testimony of his friend, Steve Gallagher, which indicated that Gallagher did not make very much profit out of the transactions.

The main thrust of the debtors' defense, however, is contained in the citation in the legislative history following § 522(b):

"As under current law, the debtor will be permitted to convert nonexempt property into exempt property before filing a bankruptcy petition. See Hearings, pt. 3, at 1355–58. *The practice is not fraudulent as to creditors*, and permits the debtor to make full use of the exemptions to which he is entitled under the law." (Emphasis added).

That language in the comment that "the practice is not fraudulent as to creditors" is supported, in part, by a comment in Colliers. 3 Collier on Bankruptcy ¶ 522.08 [4] at 522–33 (15th ed. 1979).

The debtors had cited those same comments in defense of the attempt by the trustee to set aside the exemptions in the homestead in Adversary 580–0024. In the memorandum in that case I concluded that the provisions of the Texas Constitution in Article 16, § 50, prohibiting the taking of a homestead for any purpose other than purchase money liens, improvement liens, or taxes, prohibits the setting aside by the trustee of the homestead exemption in the residence. The cited reference which indicates that the debtor is permitted to convert nonexempt property into exempt property before filing a bankruptcy petition was not reached in the memorandum in 580–0024, because of the resolution on Texas Constitutional grounds.

The commentator in each reference is addressing the subject of entitlement to exemptions. However, the unfortunate language in the comment that "the practice is not fraudulent as to creditors" is seized upon by the debtors to defend against the discharge attack. Essentially they contend that where there is no foul, there can be no penalty. That comment does not accurately reflect the law in Texas. V.A.T.S. Art. 3836(b) [3] in treating the subject of exempt personal property, specifically prohibits the retention of an exemption in personal property so acquired with proceeds of nonexempt property where there was intent to defraud, delay or hinder a creditor or other interested persons.

The fact that the statute denounces the conversion of nonexempt assets to exempt personal property with intent to hinder, delay or defraud creditors belies the contention that "the practice is not fraudulent as to creditors" under Texas law. By statute where personal property exemptions are concerned the practice *is* fraudulent in Texas. The Texas Constitution prohibits the taking of the exempt real estate, but it does not prevent the practice from likewise

---

**3.** Art. 3836(b) The use of any property not exempt from attachment, execution and every type of forced sale for the payment of debts to acquire property described in Subsection (a) of this article, or any interest therein, to make improvements thereon, or to pay indebtedness thereon with the intent to defraud, delay or hinder a creditor or other interested person from obtaining that to which he is or may become entitled shall not cause the property or interest so acquired, or improvements made to be exempt from seizure for the satisfaction of liabilities under Subsection (a) of this article.

being fraudulent as to creditors where, as here, it is made with the intent to hinder, delay or defraud creditors. Where fraud on creditors is concerned, the practice of converting nonexempt property to exempt property, personal or real estate, is equally denounced.

There is another reason why the cited references are inapplicable in Texas. From the legislative history and from further comments in the cited paragraph in Colliers it appears that the basis for that law which permits the conversion of nonexempt property to exempt property in the jurisdictions where it appears to be applicable is that that result is necessary in order to furnish the "fresh start" and to provide the debtor with minimum exemptions. In the legislative history those arguing in support of that position appear to be concerned with the fact that in some jurisdictions the exemptions permitted by the state are quite minimal. There can be scant support for that position in Texas, however, where the homestead exemption reaches· to infinity. V.A.T.S. Art. 3833(a)(3) provides a homestead exemption in a lot or lots "not to exceed in value $10,000.00 at the time of their designation as a homestead, *without reference to the value of any improvements thereon.*" (emphasis added) Therefore as long as the lot or lots have value of no more than $10,000.00 when the homestead designation is made there is no limit on the value and scope of the physical structure that may be built upon it, with or without swimming pool. The Texas exemption in real estate is by no definition "minimal".

For the above reasons, I conclude that the referenced expressions that "the practice of converting nonexempt property into exempt property before filing a bankruptcy petition is not fraudulent as to creditors" has no application in Texas. I find that Hugh D. Reed transferred proceeds of sale of nonexempt assets to exempt real estate, that by making that transfer he placed monies totalling $34,500.00 beyond the reach of the trustee and the creditors, and, regardless as to whether or not he received a reasonably equivalent value for the nonexempt assets, he effected the transfer within less that two weeks of bankruptcy with the intent to hinder, delay, or defraud creditors and the trustee.

## FAILURE TO ACCOUNT FOR CASH

The second tangible basis for the challenge to discharge is that Hugh D. Reed failed to account for the disposition of $19,-586.83 in cash during the year preceding the filing of the petition. In that regard the accountant for the plaintiffs testified that he had examined the bank statements and other records which were furnished to him. He found a discrepancy between the cash deposited and the cash withdrawn in 1979 by Reed from the personal bank accounts, and from income from Scully which was not deposited nor otherwise accounted for, totalling $45,586.83. The accountant for the debtors, in his report, disclosed a $4,900.00 repayment of a loan which was made to Reed during 1979, which increased the total of cash for which there was no accounting by $4,900.00. However, he furnished some evidence of disposition of $30,900.00 of that total ($15,000.00 cash to purchase interest in Triple BS, Inc., $6,000.00 for construction work, $4,900.00 gold acquisition and $5,000.00 cash deposited to Reed's Men's Wear account on November 1, 1979) reducing the total missing cash to $19,586.83. Reed attempted to explain the "unaccounted for" cash by his testimony, and that of his wife and of his accountant, that he habitually carried huge sums of money in cash on his person and frequently made purchases and payments in cash without obtaining receipts. He argued that the amount of "unaccounted for" cash represents a rather small percentage of the amount of money which went through his hands in 1979.

Regardless of the amount of money which might pass through the hands or accounts, $19,586.83 is a significant sum of money for which an individual is unable to explain disposition. Reed did testify that he lost some money in gambling in 1979 and, although he could not tell how much money he lost in that manner, he indicated

that it was at least $10,000.00. In the ordinary course of personal transactions the amount of money which one carries on his person, or the manner in which he spends the money, or the items for which he spends his money, is of no legitimate concern to others. However, there is one basic exception to that rule. When one files petition in bankruptcy, seeking to be discharged from his debts, those creditors who had relied upon being paid in due course have the right to know what happened to the money. They have a legitimate concern as to whether the debtor properly accounts for the disposition of money.

 I find, therefore, that Hugh D. Reed has failed to explain satisfactorily losses of assets totalling $19,586.83 to meet his liabilities within the meaning of § 727(a)(5). I find further that, in addition to the conversion of nonexempt assets to exempt assets mentioned above, that Reed has transferred those same monies totalling $19,586.83 with intent to hinder, delay or defraud creditors or the trustee. Finally, to the extent that there are no records to show disposition of the missing $19,586.83, the debtor has failed to keep and preserve books of account or records from which his financial condition or business transactions might be ascertained within the meaning of § 727(a)(3).

For the reasons cited above, singly and collectively, I conclude that Hugh D. Reed should be denied discharge.

 As far as Sharon Marcus Reed is concerned, I do not find that she has participated in the prohibited activities upon which denial of discharge is based. It is apparent that she benefitted from those transactions. It is possible that she had knowledge of the transactions. However, the reasons for denying discharge must be real and substantial, not merely technical or conjectural. Sharon Marcus Reed should be discharged of all dischargeable debts.

LET JUDGMENT BE ENTERED ACCORDINGLY.