In re Wilson PANNELL, Debtor.

MANUFACTURERS HANOVER TRUST COMPANY, Plaintiff,

v.

Wilson PANNELL, Defendant.

CITIBANK (SOUTH DAKOTA) N.A., Plaintiff,

v.

Wilson PANNELL, Defendant.

Bankruptcy No. 182–10549–21.

Adv. Nos. 182–0282–21, 182–0293–21.

United States Bankruptcy Court, E.D. New York.

Jan. 25, 1983.

Weisman, Celler, Spett, Modlin & Wertheimer, New York City, for plaintiff Citibank (South Dakota) N.A.; Marshall C. Berger, New York City, of counsel.

Michael H. Ganz, Woodbury, N.Y., for plaintiff Manufacturers Hanover Trust Co.; Robert J. Katcher, Woodbury, N.Y., of counsel.

Robert W. Tauber, Brooklyn, N.Y., for debtor-defendant.

## OPINION

CECELIA H. GOETZ, Bankruptcy Judge:

Manufacturers Hanover Trust Co. ("Manufacturers") and Citibank (South Dakota) N.A. ("Citibank") have each sued Wilson Pannell, a Chapter 7 debtor, to have certain of his debts declared nondischargeable under 11 U.S.C. § 523(a)(2)(A) on the ground that they were the result of fraud, false pretenses, and false representations. The actions were consolidated for trial. Trial was had on September 14, 1982 and October 28, 1982.

### FINDINGS OF FACT

1. Wilson Pannell, the debtor, was employed as a jewel polisher for approximately 15 years, working 13 years for the same firm (Tr., 10/28/82, at 19).

2. The jewelry business was very adversely affected by the escalating prices for gold and many firms went out of business beginning in 1979 (Tr., 10/28/82, at 25). Following the 1981 Christmas season, the majority of firms in that industry folded (Tr., 10/28/82, at 22).

3. The firm which had employed Wilson Pannell for 13 years apparently fell victim to the general decline in business; he lost his job with that concern in December, 1980 (Tr., 10/28/82, at 19, 27).

4. The slow season in the jewelry business begins in November of each year, and, except for some small upturn in the spring, the new season does not begin until July of the following year (Tr., 10/28/82, at 19–20). The busy season in the jewelry business is the period from September to November (Tr., 10/28/82, at 20).

5. From the time Mr. Pannell lost his long-term employment in December, 1980, he searched for work but he was unable to find employment again as a jewel polisher until September, 1981, the beginning of the new season (Tr., 10/28/82, at 20–21). He was laid off from this job three months later, in November, 1981, at the end of the season (Tr., 10/28/82, at 9–10).

6. During the entire year of 1981, including the three months during which Mr. Pannell was employed as a jewel polisher, he had a total income of $5,000 (PX–6, at 52–53; Statement of Financial Affairs for Debtor Not Engaged In Business, Question 2(d)).

7. Apart from the three weeks Mr. Pannell worked as a jewel polisher, his only employment was "a dollar or two dollars here and there washing windows in the complex." (Tr., 10/28/82, at 23.) Asked if he had enough to live on during this period, he replied: "Just little odds and ends from my sister, brother, mother, couple of dollars here and there for food for me and my kids." (Tr., 10/28/82, at 23.)

8. Although Mr. Pannell says he kept looking for work after November, 1981, he concedes that he realized in January, 1982 that he would not be able to find any work (Tr., 10/28/82, at 23–24). He testified as follows on direct examination by his own counsel:

"Q. * * * I see, now, when did you start to realize that you would not be able to pay your debts?

"A. Well, I realized in January and February when I was out looking for work, which I couldn't find no job and everything." (Tr., 10/28/82, at 24.)

9. When Mr. Pannell was asked when he first considered a bankruptcy petition, he responded:

"Well, when I started filing—thinking about filing was the latter part of December of [sic] January." (Tr., 10/28/82, at 16.)

10. Evidently, Mr. Pannell had built up a good credit record during the years of his employment. In December, 1981, he had a Master Card charge and a Visa Card issued by Manufacturers, and a Master Card charge and a Visa Card issued by Citibank. He had very liberal credit on these four cards, totaling in all $9,650. On his Manufacturers Master Card, he had a credit limit of $2,500; on the Visa Card, a credit limit of $2,000; on the Citibank Master Card, his credit limit was $2,650; on the Citibank Visa Card, $2,500 (PXs–M–2–K, M–1–K, C–3–L, C–4–L).

11. Until December, 1981, the month which Mr. Pannell identified as the month in which he began thinking about bankruptcy, he had made comparatively little use of these credit cards during his long period of unemployment (PX–5). Except for some purchases charged to his Citibank Visa Card, he had used his credit mainly to obtain cash. In July, 1981, he borrowed $300 against his Manufacturers Visa Card; in August, 1981, $300 against his Manufacturers Master Card and $200 against his Citibank Master Card; in September, 1981, he borrowed $300 against his Manufacturers Visa Card, $350 against his Citibank Visa Card, and $250 against his Citibank Master Card; and in October, he borrowed $300 against his Citibank Visa Card (PX–C–5). In November, 1981, his last month of regular employment, he borrowed nothing. During this same period, he kept his credit good by regularly making the minimum payment called for by each card (Tr., 9/14/82, at 17–18, 26–30, 31–32). The cash advances which he took simultaneously facilitated such payments. Thus, on the same day, August 11, 1981, on which he borrowed $250 on his Citibank Master Card, he paid $28.40 on what he owed (PX–C–3–I). Similarly, on September 4, 1981, he borrowed $300 against the same card, and paid back $34.15 (PX–C–3–J).

12. However, with the loss in November, 1981, of the only regular employment which Mr. Pannell had been able to obtain all year, he radically altered his use of his cards. The following month, he embarked on a course of conduct which netted him in a period of about six weeks approximately $3,350 in cash, and nearly another $1,400 in merchandise, or about $4,750 in all (PX–C–5).

13. Beginning December 10, 1981, Mr. Pannell both borrowed money and charged purchases to his cards in a manner inconsistent with any intention to repay. On December 10, 1981, he borrowed $500 on his Citibank Master Card (PX–C–4–M), the most he had ever borrowed on a single day against any credit card; yet, only four days later, on December 14, 1981, employing his other three cards, he borrowed another $1,650 (PXs–C–3–M, M–2–L, M–1–L). Three days later, he collected another $900, again using three cards (PXs–C–4–M, C–3–M, M–2–M). The following day, December 18, 1981, the fourth card was utilized to obtain another $300 (PX–M–1–M). Thus, in eight days, Mr. Pannell put $3,350 in cash into his pocket.

14. At the same time, he collected assorted merchandise from a variety of stores by charging his purchases to the same four credit cards against which he was borrowing so heavily. The following table reflects these purchases:

| DATE OF PURCHASE | AMOUNT OF PURCHASE | CARD USED | STORE | EXHIBIT NUMBER |
|---|---|---|---|---|
| 12/14/81 | $ 47.08 | CB (SD) MC | Regal Shoe Shop | C–4–M |
| 12/17/81 | 236.49 | MHT MC | Ira M. Goldsmith & S | M–2–M |
| 12/17/81 | 50.86 | CB (SD) VISA | Thom McAn | C–3–M |
| 12/17/81 | 75.73 | CB (SD) VISA | Triangle Stores | C–3–M |
| 12/23/81 | 81.19 | MHT VISA | Truval Jewelry Co. | M–1–M |
| 12/23/81 | 48.71 | CB (SD) VISA | Benhil Shirt Shops | C–3–M |
| 12/26/81 | 24.00 | MHT MC | Bakers Shoe | M–2–M |
| 12/26/81 | 21.65 | CB (SD) VISA | Brothers Den Inc. | C–2–N |
| 12/27/81 | 47.60 | MHT VISA | The Place | M–1–M |
| 12/28/81 | 101.00 | CB (SD) MC | Regal Shoe Shop | C–4–N |
| 12/28/81 | 29.20 | CB (SD) MC | Regal Shoe Shop | C–4–N |
| 01/02/82 | 59.49 | MHT MC | The Place | M–2–M |
| 01/05/82 | 175.88 | MHT VISA | Magna Electronics | M–1–M |
| 01/08/82 | 80.00 | CB (SD) MC | Sheraton Gift | C–4–N |
| 01/11/82 | 124.87 | MHT MC | Superfly Boutique | M–2–N |
| 01/11/82 | 86.59 | CB (SD) VISA | Superfly Boutique | C–3–N |
| 01/23/82 | 33.53 | CB (SD) VISA | Ken's Discount Inc. | C–3–N |
| 02/19/82 [a] | 70.31 | CB (SD) VISA | Florsheim Shoes | C–3–O |

[a] Month is illegible, but transaction took place prior to March 3, 1982.

15. As the foregoing table shows, on December 14, 1981, the same day on which Mr. Pannell collected $1,650 in cash, he charged $47.08 in purchases; on December 17, 1981, when he had swelled his pocket money by $900 to $2,550, he charged purchases totaling $363.08.

16. Within a six-week period, Mr. Pannell, who had been living on borrowed money during all of 1981, who had washed windows for a few dollars an hour, who had had no steady employment for over a year, except for a brief three-month period, created debts of over $1,390 for jewelry, gifts, and men's furnishings.

17. In February, 1982, Mr. Pannell was notified that his accounts were delinquent (Tr., 9/14/82, at 31, 32–33). With collection action shortly to follow, he retained Robert W. Tauber, Esq. no later than February 27, 1982 to file a petition for relief under Chapter 7 of the bankruptcy laws. The petition was filed on March 8, 1982.

18. When Mr. Pannell used his credit cards in December, 1981 and thereafter to charge purchases and to borrow money, he did not intend to pay for the purchases or to repay the money.

19. The credit extended to him was given in reliance on future repayment by Mr. Pannell of the debts created.

20. Mr. Pannell's use of his credit cards in December, 1981 and thereafter was fraudulent.

## DISCUSSION

The Bankruptcy Code excepts from discharge any debt "for obtaining money, property, services, or an extension, renewal, or a refinance of credit, by—(A) false pretenses, a false representation, or actual fraud * * *." 11 U.S.C. § 523(a)(2)(A). This section is not identical with the parallel exceptions in the Bankruptcy Act. Section 17a(2) of the Bankruptcy Act (former 11 U.S.C. § 35a(2)) excepted from discharge "liabilities for obtaining money or property by false pretenses or false representations." Other types of fraud were excepted from discharge only where the debtor was "act-

ing as an officer or in any fiduciary capacity." Former 11 U.S.C. § 35a(4).

Despite the fact that the terms "false pretenses" and "false representations" connote an overt misrepresentation, the courts held that they could embrace credit card fraud, *i.e.,* the use of credit cards just prior to filing for bankruptcy with no intention of repaying the debts thereby incurred. The courts found the necessary overt misrepresentation in the presentation of the credit card and the signature on the credit slip. These were held to be representations that the debtor had the wherewithal, as well as the intention, to pay for his purchases. If these representations were false, the debts created by the creditors' reliance on them were held to be nondischargeable. *In re Black,* 373 F.Supp. 105, 107 (E.D.Wis. 1974); *In re D'Amico,* 1 B.R. 170 (Bkrtcy.W.D.N.Y.1979).

The Code makes credit card fraud easier to reach by making nondischargeable all debts arising from any type of fraud, not simply those involving false pretenses or false representations. A thoughtful commentator tracing the legislative history of the Code has concluded that the change in the language of the statute was intended to remove the requirement of an overt misrepresentation. Zaretsky, Barry L., "The Fraud Exception to Discharge Under the New Bankruptcy Code," 53 *Am.Bankr.L.J.* 253, 257 (1979). In Professor Zaretsky's view, adding "fraud" to the false pretenses and false representations section now permits the courts "to except from discharge debts incurred without intent to repay, or by use of other false implied representations, without the need to stretch the false pretenses and false representations language." ·

■ The applicable law is well-settled. It is black-letter law that a "representation of the maker's own intention to do or not to do a particular thing is fraudulent if he does not have that intention." *Restatement (2d), Torts* § 530 (1977). "A person's intent, his state of mind, it has long been recognized, is capable of ascertainment and a statement of present intention is deemed a statement of a material existing fact, sufficient to support a fraud action." *Channel Master Corp. v. Aluminium Ltd.,* 4 N.Y.2d 403, 407, 176 N.Y.S.2d 259, 151 N.E.2d 833 (1958). More must be shown, of course, than that the promise was not kept. It must be proved that there was never any intention to perform.

■ Credit card fraud fits into this classic mold. The presentation of the credit card and the signature on the credit card receipt constitutes a promise that the credit card holder will, at some future time, pay the obligation incurred. The credit is extended in reliance on that promise, as the holder of the credit card intends. If it can be established that, in fact, at the time the debt was incurred, there was no intent to pay, then all the elements of fraud are present.

Since, obviously, few men will admit to a fraudulent intent, such intent must be established by circumstantial evidence. If all the facts are inconsistent with the intent to repay, the use of the credit card is fraudulent. While certain fact patterns tend to recur, the question of intent is an issue of fact to be decided with relationship to the facts of the particular case before the Court. Accordingly, other cases, while helpful, cannot be deemed controlling.

One court has attempted to collect the criteria which may be pertinent, such as the length of time between the charges made and the filing of bankruptcy; the amount of the charges; and the financial condition of the debtor at the time the charges are made. *In re Stewart,* 7 B.R. 551, 555 (Bkrtcy.M.D.Ga.1980). Some of the circumstances to which the courts have given weight are that the debtor was hopelessly insolvent (*Manufacturers Hanover Trust Co. v. Aversa,* Bankr. No. 77–B–3296 (Bkrtcy.E.D.N.Y., Jan. 10, 1979); *In re Jordan,* 3 BCD 1292 (S.D.Ohio, E.D.1977)); that there was a sharp change in the buying habits of the defendant (*In re Poteet,* 12 B.R. 565, 568 (Bkrtcy.N.D.Tex.1981)); or that there was a change in the defendant's pattern of paying off his indebtedness (*In re First Nat'l Bank of Dayton, Ohio v.*

*Wright,* 8 B.R. 625 (Bkrtcy.S.D.Ohio, W.D. 1981); *In re Schnore,* 13 B.R. 249 (Bkrtcy. W.D.Wis.1981); *In re Aversa, supra)).*

The issue in this case is whether all the facts and circumstances surrounding Mr. Pannell's extraordinary use of his credit cards during the months of December, 1981 and January, 1982 compel the inference that he had no intention at the time he incurred these debts of repaying them.

What were Mr. Pannell's circumstances at the time? Except for a short period of employment which had just terminated, he had been out of work for a year, dependent on odd jobs and the goodwill of relatives and friends to provide the necessities of life for himself and his family. His total income for the year, including his temporary employment, had not even reached $5,000. Because of the depressed state of his industry due to conditions which were permanent in their nature, he had no reasonable prospect of employment. Whatever hopes Mr. Pannell may have entertained of being able to resume the steady pattern of employment that had formerly characterized his life necessarily had disappeared when he lost his second job in November, 1981.

■ Up to that point, his use of his credit cards had been relatively modest, and he had been careful to make the regular minimum payments required of him. Now, with his financial situation so bleak, his habits changed radically. In two short months, he borrowed and charged on these credit cards amounts equal to his total annual income. Like most consumers, he did this aware of the fact that through bankruptcy, debts can be wiped out. Although Mr. Pannell submitted no evidence showing any extraordinary need for funds in December, 1981, he borrowed in the space of little more than one week $3,350, while simultaneously charging largescale purchases at a variety of stores. All this occurred the very same month in which he admits that he began contemplating bankruptcy. In these circumstances, how is any inference possible other than that debts of such magnitude as compared with his income were incurred, not with the intention of repaying them, but with the intention of wiping them out, along with his other obligations, through the bankruptcy courts.

Pannell's brief urging dischargeability departs from the record. It claims that Pannell was not laid off until December, 1981. Post-Trial Memorandum of Law, at 2, 6. He was, in fact, laid off in November, 1981 (Tr., 10/28/82, at 9, 21, 23). His counsel urges in his favor that the charges made on his various credit cards did not exhaust his credit limits—that he could have run up another $1,000 in charges had he elected to do so—but fraud is no less a fraud because not as great as might have been attempted.

Equally unpersuasive is the claim that Mr. Pannell's use of the credit cards "was primarily for his family and Christmas 1981. This was not unusual, to be unexpected, or, at the time, with any intent to defraud creditors." *Id.,* at 6. But the bulk of the charges, although not the borrowings against Mr. Pannell's credit cards, were made post-Christmas. Thus, the Christmas season neither explains, nor excuses, the debts Mr. Pannell incurred when he knew that living as he was on the charity of his family, he could not hope to repay them.

Indubitably, Mr. Pannell is a victim of circumstances beyond his control. The industry in which he had been employed for 13 years began falling apart in 1979 and has not yet recovered. The collapse of that industry cost Mr. Pannell not only his job, but rendered negligible any prospect of reemployment. That certainly must have been evident to Mr. Pannell during the year he zealously searched for employment and was only able to obtain a job during the height of the season from September through November.

The creditors here are not unsympathetic to Mr. Pannell's plight, and are not complaining of the debts he incurred and the loans he made in the months he was looking for employment in mid-1981, during which he apparently used his credit cards to sustain himself and his family. The only debts which they urge to be held nondischargeable are the extraordinary charges he made subsequent to November, 1981 after he lost

the one job he had been able to obtain in the full year since his long-term employment terminated, and when he knew that he had no resources from which to repay his obligations and almost no hope of employment that would make repayment possible.

The pre-November, 1981 debts are the type of debts from which the bankruptcy laws are intended to give relief: debts incurred in the honest expectation that they would, and could, be repaid. But the post-November, 1981 debts are not in that category: they were incurred in clear anticipation of the bankruptcy which followed on their heels. The law makes debts of that character nondischargeable.

Settle order and judgment on notice.