**In re Robert Renn ROTHROCK and Susan Jane Rothrock, Debtors.**

**J–W OPERATING COMPANY, Plaintiff,**

v.

**Robert Renn ROTHROCK and Susan Jane Rothrock, Defendants.**

**Bankruptcy No. 387–33230 RCM–7. Adv. No. 387–3663.**

United States Bankruptcy Court, N.D. Texas, Dallas Division.

Oct. 28, 1988.

Supplemental Opinion Jan. 10, 1989.

---

Robert M. Nicoud, Jr., Dallas, Tex., for defendants.

Conrad Kasselman, Dallas, Tex., for plaintiff.

## MEMORANDUM OPINION

ROBERT McGUIRE, Chief Judge.

This Memorandum Opinion constitutes the Court's findings of fact and conclusions of law under Bankruptcy Rule 7052.

This action by J–W Operating Company ("J–W") involves an action under 11 U.S.C. §§ 523 and 727. This Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. § 157.

The parties entered into a pretrial order making the following twenty-two stipulations of facts:

1. Robert Renn Rothrock ("RRR"), a Defendant herein, is, and at all material times was, a general partner of Apple Springs, Ltd. ("A.S.").

2. On November 11, 1983, J–W entered into an Operating Agreement with A.S.

3. Pursuant to the November 11, 1983 Operating Agreement, J–W performed services, furnished materials and incurred third-party obligations in order to operate seven oil and/or gas wells owned by A.S. The wells are located in the Apple Springs Field in Trinity County, Texas. The seven wells are the Temple Eastex No. 1, Temple Eastex No. 2, J.E. Clark No. 1, P.B. Robinson No. 1, Joyce 1–A, Joyce 1–B and Joyce 1–C (the "Wells").

4. In connection with its purchase of the Wells, A.S. borrowed certain monies from State Savings and Loan Association of Lubbock, Texas ("State Savings").

5. A.S. obtained a reservoir inadequacy insurance policy from Polaris Assurance, A.S. ("Polaris") in connection with obtaining the loan from State Savings.

6. In the Polaris insurance policy, State Savings was named as "loss payee".

7. The loan from State Savings to A.S. was funded on March 15, 1984.

8. J–W began operating the Wells, pursuant to the November 11, 1983 Operating Agreement, during March or April, 1984. By the fall of 1984, there was an arrearage due and owing by A.S. to J–W as a result of J–W's operation of the Wells.

9. In late 1984 or very early 1985, it was realized that a claim might have to be made on the Polaris inadequacy insurance policy because the Wells, as a whole, were no longer producing in economically feasible quantities.

10. In a discussion between RRR and Bob Filibeck ("Filibeck") of J–W, RRR represented that the only potential source of payment to J–W was through a recovery under the Polaris inadequacy insurance policy.

11. RRR requested of Filibeck, on behalf of J–W, that J–W continue to serve as operator of the Wells.

12. From and after the fall of 1984, J–W continued to serve as operator of the Wells.

13. A claim was made by A.S. under the Polaris inadequacy insurance policy on February 28, 1985.

14. Because Polaris refused to honor the claim, a lawsuit was initiated by A.S. in a case styled, *Apple Springs, Ltd., et al., v. Polaris Assurance, A.S., et al.*, Cause No. 85–3498, in the 95th Judicial District Court of Dallas County, Texas (the "Polaris Lawsuit").

15. After the Polaris Lawsuit was initiated, State Savings, as loss payee, formally intervened as a party plaintiff.

16. On or about December 20, 1985, State Savings was declared insolvent by the Federal Savings and Loan Insurance Corporation. All assets and liabilities of State Savings, including all rights and responsibilities as to the Polaris insurance policy and the Polaris Lawsuit were transferred from State Savings to State Federal Savings and Loan Association of Lubbock, Texas ("State Federal"). Thereafter, State Federal was made a party plaintiff in substitution of State Savings in the Polaris Lawsuit.

17. J–W filed suit against A.S. and RRR for the value of J–W's services rendered, materials furnished and third-party expenses incurred. The case was styled, *J–W Operating Company v. Apple Springs, Ltd., et al.*, Cause No. 85–14772–A, in the 14th Judicial District Court of Dallas County, Texas. On January 8, 1987, J–W was awarded final judgment against RRR and A.S., jointly and severally, in the amount of $1,559,-445.99, together with interest at the rate of 10% per annum from the date of judgment until payment.

18. On January 5, 1987, in connection with J–W's being awarded judgment against A.S. and RRR, J–W agreed to forebear in executing on the judgment in exchange for the agreement of both A.S. and RRR to use their "best efforts" to cause J–W to be paid, in accordance with an agreed-upon schedule, from the proceeds of any judgment or settlement in the Polaris Lawsuit.

19. On April 9, 1987, settlement was reached in the Polaris Lawsuit, whereby Polaris paid to State Federal the sum of

$4.25 million. From the $4.25 million settlement, State Federal was paid in full for the loan to A.S., including all principal and accrued interest to the date of settlement, all costs and all attorneys' fees.

20. In connection with the Polaris settlement, State Federal purchased the first mortgage lien note and deed of trust lien on RRR and Susan Jane Rothrock's ("Defendants" or "Debtors") house at 5710 Encore, Dallas, Texas, in the amount of $213,380. Also as part of the agreement between State Federal and RRR, State Federal released the lien on the Defendants' house and established a trust fund in the amount of $20,000 to facilitate the Chapter 7 bankruptcy of Debtors.

21. In connection with the Polaris settlement, no provision or arrangement was made to pay J–W any amount, nor were any monies paid to or received by J–W.

22. At the time of the purchase by State Federal of the note and deed of trust lien concerning the Encore property, it was the Defendants' understanding that they would not be obligated to pay any amount on the mortgage note to State Federal.

As indicated by the Stipulation, Defendants effectively received a benefit of approximately $235,000 out of the Polaris settlement. Of this sum, $20,000 was used to establish a trust fund in order to enable Defendants to file bankruptcy, and approximately $215,000 went to pay off Defendants' mortgage on their home in Dallas. The transaction was structured so that State Federal received all of the $4.25 million in the Polaris insurance proceeds, while A.S., J–W, creditors of A.S., and creditors of Debtors received nothing. State Federal used approximately $215,000 of the $4.25 million to acquire the promissory note and deed of trust on Debtors' house from the holder of the note, James A. Loven ("Loven"). State Federal then released the

deed of trust lien and forwarded $20,000 of the Polaris proceeds to the law offices of Dennis Olson to be held in trust for the Debtors' Chapter 7 bankruptcy filing. The agreement to acquire the note and deed of trust lien and set aside $20,000 to enable Debtors' bankruptcy filing was reached on or about April 9, 1987, at or about the time of the settlement of the Polaris Lawsuit. At the time of the agreement, neither Defendants nor State Federal expected that Defendants would pay the note after its purchase by State Federal. State Federal had agreed to release the deed of trust lien and set aside $20,000 for the express purpose of enabling Debtors to file bankruptcy. On June 15, 1987, Debtors filed their Chapter 7 bankruptcy, showing their house at 5710 Encore as exempt homestead property, and listing both J–W and State Federal as unsecured creditors. Thus, the ultimate effect of the transaction is no different than if Debtors had received $235,000 directly from the Polaris proceeds, applied $215,000 to pay off their note to Loven, and then forwarded an advance payment of $20,000 for their bankruptcy to the law office of Dennis Olson.

In its § 727 portion of the complaint, J–W complains of Defendants' conversion of nonexempt assets to exempt property with the intent to defraud creditors, citing in support thereof: *In re Reed,* 11 B.R. 683 (Bankr.N.D.Tex.1981), aff'd., *Matter of Reed,* 700 F.2d 986 (5th Cir.1983).

 Debtors' entitlement to a discharge must be determined by federal and not state law. *Matter of Reed, supra,* at 991. Mere conversion of nonexempt assets into exempt will not be considered fraudulent unless other evidence proves actual intent to defraud creditors. In *Reed,* the Fifth Circuit cites a number of cases reversing denial of discharge where there was no extrinsic evidence of actual intent to defraud.[1] *Id.*

---

**1.** For an example of the type of extrinsic fraud needed to show actual fraud, see, *Kangas v. Robie,* 264 F. 92 (8th Cir.1920). In that case, a bankrupt's claim to a homestead exemption was denied when the evidence established that he had obtained the purchase price of the homestead by buying merchandise on credit immediately prior to the bankruptcy, and using the proceeds of that merchandise to buy the homestead, rather than to pay his suppliers. *In re Adlman,* 541 F.2d 999, 1004 n. 7 (2nd Cir.1976).

As noted in *In re Adlman,* 541 F.2d 999 (2nd Cir.1976), and other cases in this area, § 727(a)(2) must be strictly construed against the objector and liberally construed in favor of the bankrupt. In *Forsberg v. Security State Bank,* 15 F.2d 499, 501 (8th Cir.1926), the court, in discussing its prior decision in *First National Bank v. Glass,* 79 F. 706 (8th Cir.1897), gives some of the reasoning behind the liberal construction of the predecessor to § 727(a)(2):

'An insolvent debtor may use with impunity any of his property that is free from the liens and the vested equitable interests of his creditors to purchase a homestead for himself and his family in his own name. If he takes property that is not exempt from judicial sale and applies it to this purpose, he merely avails himself of a plain provision of the Constitution or the statute enacted for the benefit of himself and his family. He takes nothing from his creditors by this action in which they have any vested right. The Constitution or statute exempting the homestead from the judgments of creditors is in force when they extend the credit to him, and they do so in the face of the fact that he has this right. Nor can the use of property that is not exempt from execution to procure a homestead be held to be a fraud upon the creditors of an insolvent debtor, because that which the law expressly sanctions and permits cannot be a legal fraud.'

*Forsberg,* 15 F.2d at 501.

In *Forsberg,* the court also discusses the case of *Amundson v. Folsom,* 219 F. 122 (8th Cir.1914), *cert. denied,* 238 U.S. 630, 35 S.Ct. 793, 59 L.Ed. 1497 (1915). In the *Folsom* case,

... the trustee in bankruptcy of the partnership, Davis & Son, and of the two individual partners, [filed action] against defendant Amundson, to set aside a transfer of a stock of merchandise and fixtures alleged to have been made with intent to hinder, delay, and defraud creditors. The special master and the District Court both found that there was a scheme on the part of Davis & Son in which Amundson knowingly aided and participated, to put the partnership assets beyond the reach of its mercantile creditors. [The court found] [t]here was a conversion of nonexempt property into exempt, but [that] there was much more than that. There was a dissolution of the partnership, a transfer of the partnership property to one partner for a meager consideration, and then an exchange by him of his personal property for real estate with the defendant, who was president of a bank which was one of the creditors of the partnership, and which received payment of its debt as part of the transaction. The partner who had thus obtained the real estate moved a structure, formerly a boathouse, upon the land, went into occupation, and claimed a homestead. The conversion of nonexempt property into exempt was a mere incident in the scheme to defraud creditors.

*Forsberg,* 15 F.2d 499, 501–502.

Commentators, judges and lawyers have been struggling with this area of the law, which is easier to describe generally, than to apply. Bkr-L Ed, SUMMARY § 4:68; WEINTRAUB & RESNICK, BANKRUPTCY LAW MANUAL ¶ 4.09 at 4–46 to 4–51 (rev. ed. 1986); 3 *Collier on Bankruptcy* ¶ 522.08 at 522–38 (15th ed. 1988).

In the case of *In re Zouhar,* 10 B.R. 154, 157 (Bankr.D.N.M.1981), the court states:

... The vastly enhanced potential for exemptions in New Mexico obviously presents the potential for abuse of legitimate exemptions. The difference, which seems initially to be one merely of degree, at some point as yet unspecified becomes a difference in kind which requires a different result. This same principle was succinctly stated by Judge Logan in *Dolese v. United States of America,* 605 F.2d 1146, 1154 (10th Cir. 1979), 'There is a principle of too much; phrased colloquially, when a pig becomes a hog it is slaughtered.' That principle fully applies here. While a bankrupt is entitled to adjust his affairs so that some planning of one's exemptions under bankruptcy is permitted, a wholesale sheltering of assets which otherwise would go to creditors is not permissible.

At least here, where the transmutation of assets was in an amount sufficient to render the debtor insolvent, and where the amount transmuted was more than sufficient to pay all of the debtor's unsecured debts, the transmutation must be stamped as fraudulent ...

The *Dolese* case was a non-bankruptcy case.

In our particular case, the amount transferred did not render the Debtors insolvent since they were already insolvent, although the amount transferred ($235,000 in effect) was the main asset to which Debtors had access.

Two recent Eighth Circuit decisions demonstrate the problems the courts have with very similar fact situations. *Norwest Bank Nebraska, N.A. v. Tveten*, 848 F.2d 871 (8th Cir.1988) and *Hanson v. First Nat. Bank in Brookings*, 848 F.2d 866 (8th Cir.1988).

Judge Arnold, dissenting in *Tveten*, notes:

... But sitting as a judge, by what criteria do I determine when this pig becomes a hog? If $700,000 is too much, what about $70,000? Would it matter if the debtor were a farmer, as in *Forsberg*, rather than a physician? ...

*Tveten*, 848 F.2d at 879. Judge Arnold further points out in *Tveten*, that "extrinsic", in the context of § 727(a)(2):

must mean something beyond the mere conversion of assets into exempt form for the purpose of putting them out of the reach of one's creditors. If Tveten had lied to his creditors, like the debtor in *McCormick v. Security State Bank*, 822 F.2d 806 (8th Cir.1987), or misled them in some way, like the debtor in *In re Reed*, 700 F.2d 986 (5th Cir.1983), or transferred property for less than fair value to a third party, like the debtor in *Ford v. Poston*, 773 F.2d 52 (4th Cir. 1985), we would have a very different case.

*Id.*, at 878. He also notes that, on the *Tveten* record, there was no evidence of that sort of misconduct and that the only difference he can really see in the *Tveten* case and the *Hanson* decision is the amount placed in exempt property by the debtor. *Id.*

In approving a statement by Judge Kishel in *In re Johnson*, 80 B.R. 953 (Bankr.D. Minn.1987), Judge Arnold further states:

... To equate a non-fraudulent intent to 'place assets beyond the reach of creditors' [sic] is ultimately to frustrate statutory exemption rights by causing a chilling effect on the full exercise of those rights. A court which causes such a chilling effect is, in a very real sense, invading legislative prerogatives by substituting its own judgment for that of the legislature.

*Tveten*, 848 F.2d at 878.

In *In re Collins*, 19 B.R. 874 (Bankr.M. D.Fla.1982), the court had denied a discharge, stating:

Some transfers certainly are permissible and should be encouraged. However, cases with a factual scenario which reveal that *business assets* which belong to creditors are being used to delete individual debts will not be permitted....

*Id.*, at 877. [Emphasis supplied]

The Court finds that the intentional structuring and effecting of the approximate $235,000 benefit conferred upon Defendants, in which RRR actively participated, constituted a fraud by RRR upon the creditors of A.S. and of Debtors, within the meaning of § 727(a)(2), by diverting business property of A.S. and RRR to RRR's exempt assets. RRR, in his affidavit in connection with the State Court action in the 95th District Court of Dallas County, Texas, pointed out that he controlled all business of A.S. as to such business relationship with J–W. State Federal was not entitled to any of the Polaris proceeds which were in excess of the indebtedness of A.S. on its $2.3 million loan to A.S. The $235,000 benefit conferred upon Debtors exceeded what was necessary to pay the State Federal loan in full.[2] Notwith-

---

**2.** *See,* Stipulation No. 17, which indicates that on January 8, 1987, J–W obtained a judgment against RRR and A.S., jointly and severally, in

standing the various attempts to categorize the $235,000 as possibly a gift, there was also testimony to the effect that the funds constituted compensation to RRR. While the intent necessary to deny discharge must be actual and not constructive, such intent may be proven by circumstantial evidence such as the debtor's action. *In re Locke*, 50 B.R. 443 (Bankr.E.D.Ark.1985). RRR testified that the purchase of his home mortgage by State Federal and the $20,000 for his bankruptcy, were wholly gratuitous and not induced by him in any manner. This was not credible testimony. State Federal's representative who was in charge of this transaction testified that, in multiple years of banking experience, he had never seen a bank structure a transaction like this. Mrs. Rothrock testified that she understood her husband was receiving compensation. State Federal's representatives, Patty McGuire and Paul Wallace, testified to the effect that, prior to April 9, 1987, the date of the Polaris settlement, there was no obligation of State Federal to pay RRR any money. Both Mr. Wallace and Ms. McGuire further testified that State Federal had been fully paid. Mr. Wallace also testified that Debtors could have been paid the $235,000 in cash, and that it made no difference insofar as State Federal was concerned as to how the payment was made. State Federal's representatives testified that the $235,000 transaction was made at the direction of their counsel. RRR, in his affidavit of July 19, 1988 (Trial Exhibit No. 90), stated that the A.S. loan had been paid in full from the Polaris proceeds. Thus, it appears substantially undisputed that funds were received in excess of the State Federal debt, and as a result of the Polaris settlement.

There was no evidence showing that, in the State Federal settlement, either A.S. or RRR released State Federal from any causes of action they might have. RRR's general partnership interest in AS has been scheduled as an asset in RRR's bankruptcy, with a value shown as –0–. A.S. had prepared, but never filed, its own bankruptcy. (See Ex. 41).

the amount of $1,559,445.99, together with in-

The payment to RRR by State Federal was not revealed to JW prior to completion of the actual settlement. Jack Driver, a limited partner in A.S. who did the accounting for A.S., testified on September 6, 1988 that he had never heard from RRR about the deed of trust and first lien purchase or $20,000 until about two months prior to September 6, 1988.

While *In re Collins*, 19 B.R. at 874, involved a diversion of funds from the debtor's sole proprietorship construction business, RRR's diversion of funds was from A.S., a partnership in which he was the sole general partner. This was a diversion of A.S.'s and RRR's business assets for the purpose of deleting a debtor's individual debts as part of the debtor's pre-bankruptcy planning. RRR's general partnership interest in A.S. was diminished by the transfer in question.

According to Trial Exhibit No. 16, RRR possessed a 70.3% ownership interest in A.S. The partners, including RRR, owned A.S. and its assets. Thus, aside from the claims of A.S.'s creditors, RRR, as an A.S. partner, owned 70.3% of the excess Polaris proceeds and 70.3% of the benefit, which Debtors ultimately derived as a result of the note purchase/release deed of trust/$20,000 trust fund transaction with State Federal.

RRR testified that the sole business activity of A.S. from and after approximately March, 1985, was the prosecution of the Polaris Lawsuit.

The *Amundson* decision points out: "... Transactions, apparently innocent when separately regarded, may take on a different significance when seen in their true connection with others...." *Amundson*, 219 F. at 125.

In *In re Locke*, 50 B.R. at 443, the Court held that, for denial of discharge purposes, once a transfer by a debtor is established as fraudulent, it is not necessary to establish the precise value of what the estate lost. The $213,380 note purchase transaction/release of lien/$20,000 trust fund was intended by RRR to enable RRR to

terest at the rate of ten percent.

place such sums beyond the reach of the creditors of A.S. and Debtors. Accordingly, RRR's discharge is denied under § 727(a)(2).

■ J–W has further claims against RRR under § 523(a)(2)(A). J–W contends that RRR represented to them that, if J–W continued as operator of the Wells, it would be paid from the Polaris insurance proceeds prior to any money being paid to RRR, and, that additionally, upon the execution of the best efforts agreement, RRR would use his best efforts to obtain a settlement in the Polaris Lawsuit, which would provide for a payment to J–W. While it has been held that a mere breach of contract is not fraud, a statement of present intention, if false, is a representation of an existing fact sufficient to support a fraud action. *In re Schmidt*, 70 B.R. 634, 640 (Bankr.N.D.Ind.1986), *citing In re Pannell*, 27 B.R. 298, 302 (Bankr.E. D.N.Y.1983); 41 Tex Jur 3d, Fraud and Deceit §§ 11 and 24. *Also see*, 3 *Collier on Bankruptcy* ¶ 523.08, 523–47 to 523–49 (15th ed.1986). *Schmidt* also stands for the proposition that a court may infer the intention not to perform the contract from the circumstances surrounding the particular case. However, subsequent conduct does not necessarily make the original representation false. *In re Schmidt*, 70 B.R. at 641.

While the Court finds that RRR breached the best efforts contract, it does not find that, at the time same was entered into, RRR had no intention of exerting his best efforts. This is true, notwithstanding the fact that the best efforts contract was entered into on January 5, 1987. (Ex. 3), and the settlement was entered into on April 9, 1987. The Court further finds that RRR did not misrepresent his intentions, as complained about by J–W. When the settlement agreement was entered into on January 5, 1987 with J–W and the judgment on January 8, 1987 (Exhibits 3 & 2 respectively), RRR was upset because he could not afford representation in the lawsuit and he thought the amount being agreed to was more than J–W was entitled to. However, notwithstanding this, and in spite of his breach of the best efforts contract, the Court is not convinced that he misstated his intentions either to J–W's representative, Filibeck, or misstated his intentions in the best efforts contract.

After entering into the best efforts contract, events moved quite rapidly for A.S. and RRR. A.S.'s counsel was threatening possible withdrawal from representation; there was a possibility that State Federal, as loss payee, would attempt to foreclose on its secured interest in the insurance policy; there was apparent disagreement between the attorneys for A.S., Akin, Gump, and the counsel for State Federal, especially over State Federal apparently not paying the counsel's fees; there were questions about the enforceability of any judgment obtained against the Norwegian company, Polaris, based upon the Polaris Lawsuit because of the treaty situation between the United States and Norway. A meeting was scheduled with the Norwegian representatives of the Polaris insurance company on April 9, 1987. The Court finds that at or about such time, that is in early April, 1987, RRR, contrary to an earlier stated position, changed his intentions and decided to seek out his own best personal interests, as opposed to any contractual obligations previously represented or entered into.

Thus, since RRR did not misstate his intentions, the alleged misstatement of intentions would not constitute sufficient "extrinsic fraud" for purposes of § 727(a)(2). *Matter of Reed*, 700 F.2d at 991, n. 3. Nor would same constitute fraud under § 523(a)(2)(A).

■ As far as Mrs. Rothrock is concerned, she did not actively participate in the prohibited activities upon which the denial of the discharge of RRR, under § 727(a)(2), is based. She benefitted from those transactions. She knew that J–W had obtained a judgment against RRR and A.S. She knew that the mortgage on her house was being purchased by State Federal as a form of compensation to RRR. Mrs. Rothrock's activity on the transactions in question did not rise to the level of

prohibited activity under § 727(a)(2), and her discharge is granted.

Various other claims and countercontentions were made by the parties. The Court further finds that the amount of the Polaris settlement proceeds was in excess of what was necessary to pay State Federal in full.

J–W is not entitled to the imposition of a constructive trust and equitable lien upon the house at 5710 Encore.

Neither of the Defendants was a fiduciary of J–W. After the execution of the best efforts agreement, RRR did not try to prevent J–W from intervening in the Polaris Lawsuit, but it is doubtful that J–W had any right to legally intervene in such lawsuit. Defendants were not acting in a fiduciary capacity on behalf of J–W. As to J–W, neither Defendant violated §§ 523(a)(4), or 523(a)(6).

All relief not granted in this adversary is denied. This ruling does not adversely affect any valid claim of Plaintiff in these bankruptcy proceedings for the judgment in State Court against RRR.

No disposition is made of the $20,000 in Mr. Olson's trust account. Such issue is reserved for further decision. Any cause of action, if any, for recovery of such funds belongs to Debtors' trustee and not J–W. Furthermore, State Federal was not a party to this lawsuit. Therefore, any residual claim it might make to such "trust" proceeds has not been adjudicated. No fee applications have been presented or ruled on with respect to such $20,000.

The Court reserves the right to make further findings of fact and conclusions of law.

## SUPPLEMENTAL OPINION

On December 14, 1988, came on for hearing the motion of Defendant Robert Renn Rothrock ("RRR") for rehearing and for modification of judgment.

RRR moved the Court to reverse its judgment denying his discharge. RRR argued that the Court erred as a matter of law by misconstruing Texas partnership law. The essence of his argument is as follows: Bankruptcy Code § 727(a)(2)(A) provides that a discharge may be denied if a debtor, with the intent to hinder, delay, or defraud a creditor, has transferred property of the debtor within one year before the date of filing of the petition. Since the excess proceeds are partnership property of Apple Springs, Ltd. ("AS"), RRR states that his interest in the partnership does not extend to those funds and, therefore, any transfer of partnership property leaves unaffected his personal property interest in the partnership, which, it is tacitly assumed, is his only property right. RRR thus contends that since he allegedly never assigned or sold his 70.3% ownership interest in the partnership, he has not transferred any of his property within the meaning of § 727(a)(2)(A).

■ As a matter of bankruptcy law, the existence of property rights is generally determined pursuant to state law and not federal law. *Butner v. United States*, 440 U.S. 48, 55, 99 S.Ct. 914, 918, 59 L.Ed.2d 136 (1979). As RRR was the sole general partner in AS, his individual property rights, if any, *vis-a-vis* the partnership property consisting of the excess proceeds, is determined by Texas partnership law.

Section 10(a) of the Texas Uniform Limited Partnership Act provides that:

A general partner shall have all the rights and powers and be subject to all the restrictions and liabilities of a partner in a partnership without limited partners, except that without the written consent or ratification of the specific act by all the limited partners, a general partner or all of the general partners have no authority to:

\* \* \* \* \* \*

(2) Do any act which would make it impossible to carry on the ordinary business of the partnership.

\* \* \* \* \* \*

(4) Possess partnership property, or assign their rights in specific partnership property, for other than a partnership purpose....

Tex.Rev.Stat.Ann. art. 6132a § 10(a) (Vernon 1964). Thus, the general partner has

all the rights of a general partner in a general partnership.

The Texas Uniform Partnership Act ("TUPA") defines the extent of a partner's property rights. Section 24 provides in the relevant part:

> The property rights of a partner are (1) his rights in specific partnership property, (2) his interest in the partnership, and (3) his right to participate in the management....

Tex.Rev.Civ.Stat.Ann. art. 6132b § 24 (Vernon 1964).

In defining the nature of the partner's right in specific partnership property, TUPA § 25(1) provides: "A partner is *co-owner* with his partners *of specific partnership property* holding as a tenant in partnership." (Emphasis supplied). *See,* Tex.Rev.Civ.Stat.Ann art 6132b § 25(1) (Vernon 1964). TUPA § 25(2)(a), (b), and (c) provide as follows:

> (a) A partner, subject to the provisions of this Act and to any agreement between the partners, has an equal right with his partners to possess specific partnership property for partnership purposes; but he has no right to possess such property for any other purpose without the consent of this partners.
>
> (b) A partner's right in specific partnership property is not assignable except in connection with the assignment of rights of all the partners in the same property.
>
> (c) A partner's right in specific partnership property is not subject to attachment or execution, *except on a claim against the partnership.* When partnership property is attached for a partnership debt the partners, or any of them, or the representatives of a deceased partner, cannot claim any right under the homestead or exemption laws.

Tex.Rev.Civ.Stat.Ann. art. 6132b (Vernon 1964). (Emphasis supplied). When property is contributed to a partnership, each partner is a co-owner of each item of property, holding as a tenant-in-partnership. *Smoot v. Smoot,* 568 S.W.2d 177 (Tex.Civ. App.–Dallas, 1978, no writ).

Section 727(a)(2)(A) refers to hindering, delaying or defrauding *a creditor* of the debtor. J–W Operating Company ("J–W") is and was, prior to the transfer, at the time of the transfer, and after the transfer, a judgment creditor against AS and RRR, jointly and severally (Exhibit 2) (see page 4 of the initial Opinion). To the extent there exists a creditor, such as J–W, which has a joint and several judgment claim against the partnership, and the partner, the partner's co-ownership right in the partnership property is subject to attachment and execution. Tex.Rev.Civ.Stat.Ann. art. 6132b, § 25(2)(c). Thus, J–W could have executed upon property of which RRR was co-owner but for the fact the property was transferred by RRR into RRR's claimed exempt homestead. At least as to J–W, there was a transfer of property of RRR with intent to hinder, delay or defraud a creditor. TUPA § 26 provides as follows:

> A partner's interest in the partnership is his share of the profits and surplus, and the same is *personal property* for all purposes.

Tex.Rev.Civ.Stat.Ann. art. 6132b § 26 (Vernon 1964). (Emphasis added).

TUPA § 28 provides that the interest of a partner in a partnership is subject to a charging order:

> (1) On due application to a competent court by any judgment creditor of a partner (or of any other owner of an interest in the partnership), the court which entered the judgment, order, or decree, or any other court, may charge the interest of the debtor partner (or such other owner) with payment of the unsatisfied amount of such judgment debt with interest thereon; and may then or later appoint a receiver of his share of the profits, and of any other money due or to fall due to him in respect of the partnership, and make all other orders, directions, accounts and inquiries which the debtor partner (or such other owner) might have made, or which the circumstances of the case may require.

Tex.Rev.Civ.Stat.Ann. art. 6132b § 28 (Vernon 1964).

RRR argues that his Chapter 7 trustee could not have *directly* reached the excess proceeds because such proceeds were not subject to execution based solely upon a judgment against RRR.

Under the previously quoted §§ 26 and 28 of TUPA, a partner's interest in a partnership is personal property and any judgment creditor of a partner may obtain a charging order from the appropriate court with respect to that partner's interest in the partnership. *Milberg Factors v. Hurwitz–Nordlicht,* 676 S.W.2d 613 (Tex.Civ. App.–Austin 1984, writ ref'd n.r.e.).

In essence, RRR's contention is that his interest in AS had no value since, at the time of the transfer, J–W was owed $1.7 million by AS, and, if the $235,000 in excess proceeds went to J–W, then his interest in AS would have no value.[1]

At least as to J–W and other creditors of both AS and RRR, jointly, the value of RRR's interest in AS was diminished and the property available to satisfy their claims has been transferred and diminished. As previously pointed out at page 13 in the initial Opinion, once a transfer by the debtor is established as fraudulent under § 727(a)(2)(A), it is not necessary to establish the value of the transfer. *In re Riddle,* 8 B.R. 797, 799 (Bankr.S.D.Fla.1980); *In re Locke,* 50 B.R. 443 (Bankr.E.D.Ark. 1985).

For the reasons stated in the foregoing opinion and on the record on December 14, 1988, the motion of RRR for rehearing and for modification is, in all things, OVERRULED.

---

1. This argument could be carried to logical extremes. For example, what if $1.7 million or $3 million had been transferred in a similar fashion?