**In re Ira MARCUS, Debtor.**

**Jenny MARCUS, Plaintiff,**

**v.**

**Ira MARCUS, Defendant.**

**Bankruptcy No. 84 B 20015.
Adv. No. 84 ADV. 6034.**

United States District Court,
S.D. New York.

Dec. 27, 1984.

---

Chappaquiddick Island, featured in "House & Garden" and "Architectural Record," to a friend twenty days after her "palimony" verdict was entered against him and one day before he executed his bankruptcy petition. The sale price was $110,000, which was approximately what it cost the debtor to purchase the land and construct the house ten years earlier. The plaintiff is the debtor's second largest creditor, following the United States Government which is secured to the extent of a tax lien on the debtor's other home in Katonah, New York. The debtor caused the cash proceeds from the sale to be paid to various attorneys to whom he was previously indebted, and directed a $25,091.15 payment to be made to the federal government in reduction of his tax liability in excess of $300,000.

## FINDINGS OF FACT

1. On January 17, 1984, the debtor, Ira Marcus, filed with this court his petition for relief under Chapter 7 of the Bankruptcy Code. A few hours earlier on the same day, the plaintiff, Jenny Reid Marcus, filed a "palimony" judgment against the debtor in the amount of $203,592.96 in the New York State Supreme Court, Westchester County, based upon a jury verdict rendered in her favor on December 22, 1983.

Wiener, Zuckerbrot, Weiss & Brecher, New York City, for Jenny Reid Marcus; Felice F. Mischel, New York City, of counsel.

Stephen A. Mishkin; Aronwald & Pykett, White Plains, N.Y., for Ira Marcus; Daniel J. Pykett, White Plains, N.Y., of counsel.

## DECISION ON OBJECTIONS TO DISCHARGE

HOWARD SCHWARTZBERG, District Judge.

Jenny Reid Marcus, a "palimony" judgment creditor in the amount of $203,592.96, seeks to deny the debtor's discharge for various reasons under 11 U.S.C. § 727, including the accusation that he sold his three-level Martha's Vineyard house on

2. When the debtor filed his Chapter 7 petition on January 17, 1984, he listed in his schedules that in addition to the plaintiff's claim, he was indebted to three creditors for loans in the amounts of $60,926, $10,000 and $4,600. He also owed fees to an accounting firm in the sum of $2000 and an attorney's fee of $2500. The plaintiff is the debtor's largest general unsecured creditor. His tax liabilities were listed as $807,558, which included a $352,459 tax lien of the Internal Revenue Service. The debtor's assets consisted of personal property in the sum of $33,414 and a one family residence in Katonah, New York, which the debtor valued at $350,000. The Katonah property was covered by a mortgage of $30,400 and was also subject to the Internal Revenue Service's tax lien of $352,459.

Hence, the debtor was insolvent in January of 1984, a fact which he readily admitted when he testified in this case, in that his liabilities exceeded his assets.

3. The debtor's cash flow situation is a different matter. He is an officer and salesman of Spectrachem Corp. of Paterson, New Jersey and owns five percent of the stock of this corporation. The debtor's W–2 Form for 1983 reflects gross payments from this company of approximately $137,000. The debtor is also the sole shareholder of Ira Marcus, Inc., which is a selling vehicle for the debtor's sales activities for Spectrachem Corp. The debtor pilots an airplane that is owned by Ira Marcus, Inc.

4. On January 11, 1984, the day before the debtor signed his bankruptcy petition, he sold his interest in a house on Chappaquiddick Island, Martha's Vineyard, Massachusetts to a corporation formed by Jon Edelman, who was a friend of the debtor for about four years. Mr. Edelman is a principal in an arbitrage firm in New York City and also pilots airplanes that he owns. The debtor and Mr. Edelman occassionally flew in each others' airplanes.

5. In 1973, the debtor purchased a one-quarter acre site on Chappaquiddick Island on Martha's Vineyard, surrounded on three sides by a wildlife reservation. He paid approximately $13,000 for the land. The debtor then constructed a three-level modernistic home on the property at a cost of between $90,000 to $100,000. The home was displayed in the November, 1977 issue of House & Garden magazine and featured on the cover of the May, 1978 issue of the Architectural Record, a McGraw-Hill publication. The latter magazine described the home, on page 94, as follows:

MARCUS HOUSE
CHAPPAQUIDDICK ISLAND
MYRON GOLDFINGER, ARCHITECT
Three vertical shafts and a narrow, projecting deck give this Massachusetts vacation house its lively, characteristic massing. The shafts contain stairs, baths and triple-stacked flues, together arranged in a triangular plan that forms a rigid structural frame. It is a tall house, closed on two sides against weather and open to a panoramic water view on the third. The main living spaces are on the middle level lifted just above surrounding treetops and the parents' bedroom (designed as a pair of intersecting bridges) is located on the level above. The long deck, which steps out so purposefully over the landscape, is an extension of one of these bridges and points directly toward Nantucket Island in the distance.

The play of triangular and right angle forms gives the massing unusual energy. The interior spaces derive much of their sculptural excitement from the intersection of bridges and the lines of force they generate so freely. The master bedroom, more of a spatial event than a room perhaps, is the climax of the design and celebrates its importance by opening to almost everything: the main living spaces below, the view to the horizon, the sky above.

6. The Chappaquiddick house was financed by a loan from the Plymouth Savings Bank. The loan was collateralized by a mortgage given by the debtor and the plaintiff, Jenny Reid Marcus. When the debtor sold the Chappaquiddick house on January 11, 1984, the debtor and the plaintiff were both liable under the mortgage for the sum of $45,058.74.

7. On March 16, 1982, the plaintiff caused to be filed and recorded in the deeds book of Dukes County, Massachusetts, the appropriate recording office with respect to the Chappaquiddick house, a lis pendens which gave notice that she was a plaintiff in an action against the debtor in the New York Supreme Court, Westchester County, and that such action affected the title to the Chappaquiddick property.

8. In early December of 1983, Jenny Reid Marcus commenced a trial against the debtor in the Supreme Court of the State of New York, County of Westchester, seeking a declaration of paternity with respect to their son, a distribution of assets in the nature of "palimony" and a claim for di-

vorce based upon a common law marriage. The latter claim was dismissed by the court and the matter was tried in the contract part of the state court. A jury verdict in favor of the plaintiff in the amount of $150,000 plus interest was rendered on December 22, 1983.

9. On January 11, 1984, one day before he executed his bankruptcy petition, the debtor sold the Chappaquiddick house to Wasque Point Corp., a corporation formed by Jon Edelman solely for the purpose of taking title to the Chappaquiddick house. No contract of sale was involved. There was no proof that the debtor offered the house for sale to anyone else nor did the debtor place the house with any broker in order to obtain the top market price for the property. The sale price was $110,000. The debtor received from Jon Edelman a check for $64,376.15. Additionally, Edelman paid to the Plymouth Savings Bank the sum of $45,702.69 as the balance due under the mortgage against the property. However, the mortgage was not satisfied. Jon Edelman received from the Plymouth Savings Bank an assignment of the mortgage, with the result that the joint mortgagors, namely the debtor and the plaintiff, Jenny Reid Marcus, continued liable under the mortgage note. The deed to the property in favor of Wasque Point Corp. was recorded on January 17, 1984, the same day the debtor filed his Chapter 7 petition.

10. The debtor's appraiser valued the property as originally worth approximately $165,000, less the cost of repairing windows, a skylight, and discounting the fact that the property is approachable only by means of a dirt road which is not in good condition, for a current market value of $140,000. It was also noted that because the house was three levels high, it was found to be objectionable by some of the neighbors who believed that a house that was higher than the treetops obstructed the natural view of the horizon. The plaintiff's appraiser valued the house at $450,000, because of its unique structure and location. He observed that because the house was surrounded by a wildlife preserve it was as if the house was located on one hundred acres. Additionally, the house has a spectacular view of the ocean. The debtor's attorney who prepared his bankruptcy petition admitted that during the course of an examination in the "palimony" case, he testified that the debtor's accountants furnished counsel with information that the debtor's records ascribe a $250,000 value for the Chappaquiddick house. In light of the foregoing, it is clear that the $110,000 Jon Edelman paid to purchase this house was an unusually low figure and did not represent a reasonably equivalent value in exchange for the debtor's deeding the house to Wasque Point Corp. Indeed, Jon Edelman's original outlay of $110,000 may be reduced by payments that might be enforced against the plaintiff, as co-mortgagor, under the $45,058.74 mortgage that was assigned to Edelman and with respect to which no document of satisfaction was executed.

11. The debtor gave as his reason for selling the Chappaquiddick house, the fact that he was experiencing financial difficulties and that the Internal Revenue Service was threatening to foreclose the tax lien against his Katonah, New York property. However, only the Katonah home was encumbered by the IRS tax lien; the Chappaquiddick home, which was the debtor's only substantial asset, was not subject to the IRS tax lien. Moreover, the debtor did not reside at the Katonah home at that time. In any event, the debtor did not believe that he was going to save the Katonah home because he was then preparing his Chapter 7 bankruptcy petition, which he signed on January 12, 1984, the day after the sale of the Chappaquiddick house. Obviously, the debtor knew that all of his property would be turned over to a trustee in bankruptcy for liquidation and distribution to his creditors. It is evident that the debtor intended to dispose of his only major asset before he turned over his property to a trustee in bankruptcy and to distribute the proceeds to those selected creditors he wished to prefer.

12. Accordingly, the check dated January 16, 1984, in the amount of $64,376.15,

that was received from Jon Edelman was turned over to Stephen A. Mishkin, the debtor's attorney and certified public accountant, who deposited the check in his escrow account on January 18, 1984, one day after he filed the debtor's Chapter 7 petition on January 17, 1984. In anticipation of receiving these funds, Stephen A. Mishkin issued the following six checks on January 12, 1984 from his escrow account, in accordance with instructions from the debtor:

| | |
|---|---|
| Internal Revenue Service | $25,091.15 |
| Jeffrey Norton, Esq. | 400.00 |
| Stephen A. Mishkin, P.C. | 5,000.00 |
| Stephen A. Mishkin, P.C. | 7,500.00 |
| Leonard Lombardi, Esq. | 1,000.00 |
| Arthur J. Spring, Esq. | 25,385.00 |

Hence, all of the sale proceeds of $64,376.15 were distributed to the debtor's unpaid lawyers and in partial reduction of the debtor's federal tax liability that exceeded $300,000.

13. The plaintiff, Jenny Reid Marcus, whose joint liability continued under the mortgage which was assigned to Jon Edelman, did not receive any portion of the proceeds and was effectively prevented from sharing in any equity in the Chappaquiddick property as the largest general unsecured creditor because the property was transferred by the debtor on the eve of the filing of his bankruptcy petition and before she could record her $203,592.96 judgment as a lien against the Chappaquiddick property.

14. In view of the foregoing, there are no credible facts to dispute the finding that the debtor transferred his Chappaquiddick property to his friend, Jon Edelman, for an unreasonably low value in order to use the proceeds to prefer certain selected creditors before he filed his Chapter 7 bankruptcy petition.

15. It is also clear that the debtor desired to transfer his Chappaquiddick property to his friend, Jon Edelman, and thereafter promptly filed a Chapter 7 bankruptcy petition, in order to denude his estate of any assets which might serve as a basis for distribution to the plaintiff, his largest general unsecured creditor.

16. Such transfer of the Chappaquiddick house to the debtor's friend, Jon Edelman, one day before the debtor executed his Chapter 7 petition, was manifestly made with an actual intent to hinder, delay or defraud the plaintiff, Jenny Reid Marcus, who then was the debtor's largest general unsecured creditor.

## DISCUSSION

■ This "palimony" judgment creditor's flames of wrath were further fueled by the debtor's sale of his Chappaquiddick home to a friend for an unreasonably low price on the eve of bankruptcy and the distribution of the proceeds to certain selected creditors, mainly lawyers and the IRS. Since the plaintiff is neither the spouse nor the former spouse of the debtor, as required for purposes of contesting the dischargeability of her "palimony" judgment under 11 U.S.C. § 523(a)(5), she elected, instead, to invoke 11 U.S.C. § 727(a)(2)(A) to bar the debtor's general discharge on the ground that "the debtor, with intent to hinder, delay, or defraud a creditor ... transferred ... property of the debtor, within one year before the date of the filing of the petition ...." This language is substantially similar to the wording in 11 U.S.C. § 548(a)(1), which proscribes as an avoidable fraudulent transfer "any transfer of an interest of the debtor in property ... that was made or incurred on or within one year before the date of the filing of the petition, if the debtor ... made such transfer ... with actual intent to hinder, delay or defraud any entity to which the debtor was ... indebted ...." Unlike 11 U.S.C. § 548(a)(2), which presumes fraud if the factors of insolvency and unreasonably equivalent value are established, an actual intent to hinder, delay, or defraud must be established in order to bar a discharge under 11 U.S.C. § 727(a)(2)(A) and to avoid a transfer under 11 U.S.C. § 548(a)(1). *In re Adlman* 541 F.2d 999, 1003 (2d Cir.1976). *Accord Lovell v. Mixon,* 719 F.2d 1373, 1376–77 (8th Cir.1983);

*First Texas Savings Association v. Reed (In re Reed)*, 700 F.2d 986, 991 (5th Cir. 1983).

■ If this were simply a matter where the debtor preferred his former lawyers and the IRS over his "palimony" judgment creditor, the debtor would be able to rely upon *Coder v. Arts*, 213 U.S. 223, 242–45, 29 S.Ct. 436, 443–45, 53 L.Ed. 772 (1909) and *Van Iderstine v. National Discount Co.*, 227 U.S. 575, 582–83, 33 S.Ct. 343, 344–45, 57 L.Ed. 652 (1913) for the proposition that the preference of some creditors over others may authorize a trustee in bankruptcy to avoid the preference, but, without more, does not establish a wrongful intent to hinder, delay or defraud creditors. However, a debtor's collusion with a third party in order to finance the giving of a preference may be the basis for establishing a transfer with actual intent to hinder, delay or defraud creditors. *Dean v. Davis*, 242 U.S. 438, 444, 37 S.Ct. 130, 131, 61 L.Ed. 419 (1917) (the insolvent debtor gave his brother-in-law a mortgage upon most of his property in exchange for $1600 to be used to satisfy the debtor's liability to another under forged notes). In the instant case, Jon Edelman knew before he purchased the Chappaquiddick house that the debtor was experiencing financial difficulties. He also knew that the plaintiff no longer resided with the debtor and had filed a lis pendens against the property because of her lawsuit against the debtor, which culminated in the "palimony" judgment. However, there was no proof that Jon Edelman intended later to resell the property to the debtor or that he had actual knowledge of the plaintiff's judgment. In any event, the issue of Jon Edelman's good faith, or lack of it, is immaterial because the evidence reveals that when the debtor transferred the property to Edelman, the debtor actually intended to hinder, delay or defraud the plaintiff from recording her "palimony" judgment in time to establish the judgment as a secured claim against the Chappaquiddick house.

The debtor's explanation that he sold the Chappaquiddick house to forestall an IRS tax lien foreclosure against his home in Katonah, New York does not withstand a close scrutiny. Had the debtor desired to reduce his personal nondischargeable federal tax liability he would have applied all of the proceeds from the Chappaquiddick sale towards the IRS claim rather than distributing the bulk of the proceeds to his lawyers in payment of antecedent debts. Moreover, had the debtor wished to maximize the payment to the IRS he would have attempted to get the highest market value for the Chappaquiddick house by placing it for sale with real estate brokers or publicly advertising the house for sale. The debtor did neither. Instead, he sacrificed the property for approximately what it cost him ten years earlier, notwithstanding a continuing rising real estate market in the Martha's Vineyard area. Indeed, the debtor was in such a hurry to dispose of the property after the plaintiff was awarded her "palimony" judgment twenty days earlier that he never even bothered to draw up a written contract of sale. Time was truly of the essence since the debtor was about to sign his bankruptcy petition the next day. After the Chapter 7 petition was filed, all of the debtor's property passed to his trustee in bankruptcy pursuant to 11 U.S.C. § 541, so that a potential tax lien foreclosure by the IRS against the Katonah, New York house (in which the debtor did not reside) was then a matter to be handled by the trustee in bankruptcy; the bankruptcy petition deprived the debtor of standing to contest the tax foreclosure. *See Fitzgerald v. W.F. Sebel Co., Inc.*, 295 F.2d 654, 656 (10th Cir.1961); *Commercial Credit Business Loans, Inc. v. Northbrook Lumber Co.*, 22 B.R. 992, 995 (N.D. Ill.1982); *See also In re Lapointe*, 39 B.R. 80 (Bkrtcy.W.D.Ky.1984) (absent "real possibility of a surplus," debtor in a liquidating bankruptcy did not have standing to object to claim); *In re Silverman*, 10 B.R. 734, 735 (Bkrtcy.S.D.N.Y.1981) ("It is hornbook law that a bankrupt is restricted to objecting to creditors' claims only in cases where there is no trustee who could properly object or where a disallowance of the claim objected to would produce a surplus

for the bankrupt."), *aff'd,* 37 B.R. 200 (S.D. N.Y.1982). Accordingly, the threatened tax lien foreclosure against the debtor's Katonah, New York house was not the reason why the debtor sold his equity in the Chappaquiddick house to his friend, Jon Edelman, on the eve of filing his Chapter 7 bankruptcy petition.

The debtor's sacrifice of the Chappaquiddick house to his friend, Jon Edelman, at a time when the debtor was insolvent, one day before he executed his bankruptcy petition and within one week before the petition was filed, had the effect of stripping his estate of his only major asset. The timing of the sale was such that the plaintiff was prevented from recording her "palimony" judgment as a second claim against the property and was thereby relegated to the status of being the largest general unsecured creditor in a nominal asset bankruptcy case where the general unsecured creditors would have little hope for receiving any dividend. The circumstances in this case combine to give rise to sufficient proof that the real reason for the transfer of the Chappaquiddick house to Jon Edelman was the debtor's intention to hinder, delay or defraud the plaintiff, who is the debtor's largest general unsecured creditor. This point was early expressed by the Second Circuit Court of Appeals in *In re Kearney,* 116 F.2d 899, 900 (2d Cir.1940) as follows:

> As the transfer stripped the bankrupt of all his assets, there was reasonable cause to believe that he made it with intent to hinder, delay or defraud his creditors. Having failed to prove the contrary, he was not entitled to a discharge under Sec. 14 of the Act, 11 U.S. C.A. § 32.

Similarly, in *Baltic Linen Co., Inc. v. Rubin (In re Rubin),* 12 B.R. 436 (Bkrtcy.S.D. N.Y.1981), Judge Berk said:

> While "actual intent to hinder, delay, or defraud is not always easy to define or prove, an inference of actual intent may be drawn from convincing evidence of extrinsic fraud. Further, where valuable property has been gratutitously transfer-

red, or transferred for inadequate consideration, a presumption arises that such transfer was accompanied by the actual fraudulent intent necessary to bar a discharge.

*Id.* at 441 (footnote omitted). *Accord Jarnicki v. Clemons (In re Clemons),* 42 B.R. 796, 800 (Bkrtcy.S.D.Ohio 1984); *First National Bank & Trust Co. v. Reed (In re Reed),* 18 B.R. 462 (Bkrtcy.E.D.Tenn.1982).

Having determined that the debtor has not satisfied 11 U.S.C. § 727(a)(2)(A) and is therefore not entitled to a discharge, there is no need to consider the plaintiff's additional grounds for barring the debtor's discharge, namely the allegation dealing with a false oath proscribed under 11 U.S.C. § 727(a)(4)(A) and the application of 11 U.S.C. § 727(a)(3), involving the debtor's obligation to preserve books and records from which his financial condition might be ascertained.

## CONCLUSIONS OF LAW

1. Plaintiff has satisfied her burden of proof under Bankruptcy Rule 4005 of establishing that the debtor, with actual intent to hinder, delay or defraud a creditor, has transferred property of the debtor within one year before the date of the filing of his petition for relief under Chapter 7 of the Bankruptcy Code, as proscribed under 11 U.S.C. § 727(a)(2)(A).

2. The debtor shall not be granted a discharge in bankruptcy because, with actual intent to hinder, delay, or defraud the plaintiff, his largest general unsecured creditor, he transferred title to his Chappaquiddick house on January 11, 1984, within one year before he filed his petition for relief under Chapter 7 of the Bankruptcy Code on January 17, 1984.

3. Submit judgment in accordance with Bankruptcy Rule 9021(a).