**In re George E. LOCKE, Debtor.**

**FIRST COMMERCIAL BANK, Plaintiff,**

v.

**George Edward LOCKE, Defendant.**

**No. LR 83–204M.**
**Adv. No. AP 83–643M.**

United States Bankruptcy Court,
E.D. Arkansas, W.D.

April 1, 1985.

Richard D. Taylor, Friday, Eldredge & Clark, Little Rock, Ark., for plaintiff.

Charles D. Davidson, Little Rock, Ark., for defendant.

## ORDER DENYING DISCHARGE

JAMES G. MIXON, Bankruptcy Judge.

On March 2, 1983, First National Bank in Little Rock (now First Commercial Bank) and two other creditors filed an involuntary Chapter 7 petition against George E. Locke.

On April 27, 1983, a consent order for relief was entered, and Ralph L. Sloan was appointed Trustee. On July 15, 1983, the debtor filed his Chapter 7 schedules and statement of affairs. On September 22, 1983, an Order was entered extending the time for filing objections to the debtor's discharge to December 21, 1983.

On September 23, 1983, First Commercial Bank (First Commercial) and First American National Bank filed a complaint objecting to the debtor's discharge pursuant to 11 U.S.C. § 727(a)(2)(A). The allegations in the complaint objecting to discharge were insufficient because they did not allege specific facts as required by Bankruptcy Rule 7009. On November 17, 1983, with leave of the Court, an amended complaint was filed alleging specifically that the debtor had

made substantial transfers of his assets, without sufficient consideration, with the intent to hinder, delay or defraud creditors of the estate. The complaint alleged transfers of Locke Shopping Center valued at $360,000.00, Kroger building in Hamburg valued at $335,863.00, commercial real estate valued at $835,220.00, home valued at $148,500.00, lake house valued at $88,000.00, and condominium valued at $150,000.00.

On January 23, 1985, a second amendment to the complaint was filed alleging that the debtor failed to keep or preserve sufficient records and that the debtor failed to explain satisfactorily the loss of assets or deficiency of assets to meet liabilities under 11 U.S.C. § 727(a)(3) and (a)(5). The debtor filed a motion to dismiss the second amended complaint, and the Court granted the motion on the day set for trial. *See, In re Fischer*, 4 B.R. 517 (Bkrtcy.S.D.Fla. 1980); 4 *Collier on Bankruptcy*, ¶ 727.14 (15th Ed.1980).

The schedules filed by the debtor list liabilities totaling $17,814,066.33 and assets of $1,578,629.00, as of April 1983. A financial statement given to First Commercial in January, 1982, however, listed assets at $4,556,170.00 and reflected a net worth of $4,556,170.00. Liabilities were represented at that time to be only $433,000.00 and were not allocated as to specific assets. Among the assets listed were the following:

| | | |
|---|---|---|
| 1. | Stock in Farmers Bank Hamburg | $288,750.00 |
| 2. | Stock in Collins, Locke & Lasater, Inc. | $133,000.00 |
| 3. | Stock in Locke-McCord Buick, Pontiac, GMC, Inc. | $175,000.00 |
| 4. | Commercial real estate (3 acres, Benton) | $ 37,500.00 |
| 5. | Kroger Building, Hamburg | $335,863.00 |
| 6. | Commercial Real Estate (Andy's) | $803,220.00 |
| 7. | Livestock | $120,000.00 |
| 8. | Automobiles (5) | $ 60,000.00 |
| 9. | Lake House | $ 88,000.00 |
| 10. | Lot River Ridge-Little Rock | $110,000.00 |
| 11. | Stock in Auto's Unlimited | $ 55,000.00 |
| 12. | Ashley Realty Co. | $ 4,200.00 |
| 13. | Home in Hamburg | $148,500.00 |
| 14. | Lots | $ 22,000.00 |
| 15. | ½ Interest Deep South Construction | $750,000.00 |
| 16. | Locke Shopping Center | $166,000.00 |
| 17. | Locke Insurance Agency, Inc. | $200,000.00 |
| | TOTAL | $3,497,033.00 |

In 1982, the debtor had diverse businesses and investments and was heavily indebted to First Commercial. The amount of the debt was not shown relative to a date although it was described as substantial (in excess of $2,000,000.00). Locke was, according to the testimony, over the loan limit, and the bank was concerned. At the bank's request, a meeting was held between representatives of the bank and the debtor, and the bank indicated that it desired that the debtor liquidate some of his assets for the purpose of reducing his loan balances with it. This meeting occurred in the fall of 1982, although the testimony is conflicting on this point.

What followed was a deliberately conceived scheme by the debtor to defraud creditors by quickly placing as many of the debtor's assets as possible out of the reach of creditors. By the time the debtor was put in involuntary bankruptcy most of his valuable assets were gone, and not one penny of equity in any of the assets discussed hereinafter was preserved for creditors.

I.

FARMERS BANK STOCK, HAMBURG

($288,750.00)

On January 31, 1982, the debtor's financial statement represented that the debtor owned $288,750.00 worth of stock in Farmers Bank of Hamburg. The debtor testified that prior to bankruptcy Worthen Bank & Trust Company (Worthen) foreclosed on certain portions of this stock to pay an $80,000.00 debt. Locke said he did not know how much of the stock was pledged to Worthen, and that he did not know what happened to the rest of it. This stock was not listed on the bankruptcy schedules as an asset nor was its transfer listed. Dan Lasater testified that some of the Ham-

burg Bank stock was pledged at the First American National Bank to secure a $100,000.00 loan to the debtor which Lasater had guaranteed, that the bank called the loan, and that he paid it off and took the stock. He did not say how many shares he received. He estimates the value at $6,000.00 and said that this transfer occurred in 1982 or 1983. The schedules reflect that the debtor received a dividend of $4,331.24 from this stock during 1982, and this is corroborated by the 1982 tax return which was introduced as an exhibit. The stock transfer is not reflected on debtor's 1982 tax return. The debtor omits from his petition any mention of this transaction, nor is Dan Lasater shown as a creditor of George Locke.

## II.

### STOCK IN COLLINS, LOCKE & LASATER, INC.

### ($133,000.00)

The debtor's financial statement reflects that his stock in Collins, Locke & Lasater, Inc. was worth $133,000.00. In 1982, Collins, Locke & Lasater, Inc. (now Lasater & Company or Lasater Investments, Inc.) was, according to Dan Lasater, doing quite well. The company was owned ⅓ by the debtor, ⅓ by Dan Lasater, and ⅓ by David Collins. The debtor testified that his stock was pledged at First American National Bank in North Little Rock, Arkansas, to secure a $200,000.00 loan. Lasater testified that the bank called the loan, and he caused the corporation to pay the bank $200,000.00 and took the stock as treasury stock, thereby terminating Locke's interest. Lasater testified that he did not think the stock was worth $200,000.00. The debtor still works at Lasater and Company, but now as an employee rather than an owner, where he is paid a salary and furnished with an automobile.[1]

The corporation's purchase of its own stock for $200,000.00 is without considera-

tion to the corporation.[2] The stock transfer is not reported on Locke's 1982 tax return, and on his petition, debtor said he owed $250,000.00 to the bank, not $200,000.00.

## III.

### STOCK IN LOCKE–McCORD BUICK, PONTIAC, GMC, INC.

### ($175,000.00)

### COMMERCIAL REAL ESTATE, BENTON

### ($37,500.00)

The automobile dealership stock and real estate, is located in Benton, Arkansas, and debtor's interest was listed on his financial statement as being worth $175,000.00 and $37,500.00, respectively. Stock in this corporation was owned 50% by the debtor and 50% by Billy McCord, the debtor's son-in-law. The debtor's petition asserts that the stock in this corporation was sold for assumption of debt and small equity and that the proceeds of the sale were used by the debtor for living expenses and payment on homestead. At the trial, however, on direct examination, the debtor testified that he owed Dan Lasater a debt at that time and paid him the entire proceeds from the sale which consisted of a $100,000.00 cashier's check and two notes from the purchaser, one for $60,000.00 and one for $18,219.00, all payable to Locke. This transaction occurred in early 1983, and the debtor described the sale as a miracle for creditors. McCord said that the sale price was a steal. The debtor's stock in the dealership apparently had been previously pledged to Dan Lasater who had physical possession of it at the time of the sale. Both the debtor and Lasater testified on direct examination that the stock pledge was to secure a personal debt of the debtor, but neither testified as to any particular amount. In response to questions by the Court and questions on cross-examination,

**2.** See, In re Roco Corp. d/b/a Standard Supply Company, 21 B.R. 429, 9 B.C.D. 233 (Bkrtcy.D.R. I.1982).

both alleged that actually this payment was on a debt of the corporation, not the debtor. The corporation's balance sheet affirmatively shows no debts were owed by the corporation to Lasater in that amount as of September, 1982. Lasater said he has never seen any of his records evidencing any indebtedness owed by Locke or the corporation, although he thinks there are records.

Locke said that he has no documentation of any of his debts to Lasater and does not know of the existence of any. Locke also said on direct examination that he was not sure whether he owed Lasater more than what he paid. In his deposition, however, Locke had previously said that around early 1983 he did not know if he owed Lasater *any* money; then he said he owed only small debts, and that he did not know of any large debts that he owed Lasater. He also testified at the deposition that he now owes Lasater $100,000.00 or $90,000.00 for living expenses borrowed right before he was put into bankruptcy.

Dan Moudy, an attorney who works for Lasater, testified that he represented Locke in the closing. He said that he delivered the notes and a cashiers' check to Locke at the closing, but left and did not know what happened to either. Moudy received the stock certificates from Lasater, although he neither asked for nor received any promissory note from the debtor. He said he has never seen any such note. Lasater recalls the transaction the same up to the point where the check was delivered. He testified he does not remember anything more about the check, such as what he did with it, but is sure it was handled by his staff. He does remember that he took the note to First American National Bank and discounted it for cash. The bank did not introduce the check.

## IV.

### KROGER BUILDING, HAMBURG

($335,863.00)

This real estate is a 13,556 square foot building in Hamburg, Arkansas, which was owned by the debtor and leased to the Kroger Company. It was subject to a lease with rent payable at $10,600.00 per annum, plus 1% of gross sales over $1,900,-000.00 earned by the tenant. Patsy Thomason, an employee of Lasater, testified that in 1983, $2,800.00 rent was received as a result of the override and $237.00 in 1984. Debtor sold the building to Dan Lasater for $85,000.00 which was the amount owed against the property. The debtor testified that this debt was owed to First Commercial and when it was sold First Commercial got all the money. Plaintiff's Exhibit 7 shows the debt to be to Farmers Bank. Debtor's tax return reflects this transfer and represents that the $85,000.00 sale price was also the debtor's cost basis. The tax return does not reflect any rent income from this source for 1982. Kroger Company had a right of first refusal. The debtor's agent wrote a letter on August 17, 1982, to Kroger representing that a proposed sale was to be for $125,000.00, not $84,000.00. Kroger declined to exercise its option at $125,000.00, and there is no evidence that Locke even submitted the $85,-000.00 purchase price to Kroger for consideration.

The debtor had this asset insured for $296,115.00 through his own insurance agency. The debtor's financial statements represented this asset to be worth $335,-863.00 in 1982, 1981, and 1980. The petition recites the asset was sold to Lasater for assumption of debt—no equity although the sale was actually for cash. The debtor said he employed his friend, John Spivey,[3] a realtor from Hamburg to find a buyer for the building. Mr. Spivey admitted that no listing agreement was executed, and his effort to sell was for only 30, maybe 60, days. He did not advertise the property for sale, and never listed it in the multi-list. The debtor stated that he sold the Kroger Building ten or fifteen days after the meeting with bank officials. The deed was recorded on October 12, 1982.

---

**3.** Spivey was also one of Locke's transferees. See Paragraph IX, *infra.*

Lasater purchased the building for cash, paid by Collins, Locke & Lasater, Inc.[4] but title was taken in the name of Lasater Farms, Inc., a corporation which is owned by a trust in favor of Lasater's children, and which Lasater controls. The sale was admittedly hurriedly done because it was completed without an examination of title, and Lasater learned later that the property was encumbered by a tax lien. Lasater admitted that he had never purchased real property, before or since, without a check on the title, but that both he and Locke were in a hurry because they were anxious to comply with First Commercial's request to liquidate Locke's assets. Locke said the asset was a bad investment and a liability to him. The stated consideration computes to $6.26 per square foot for the building, not including the parking lot and other grounds. The Court heard no other evidence of value.

V.

## COMMERCIAL REAL ESTATE—ANDY'S RESTAURANTS

### ($803,320.00)

The debtor stated on his petition that he sold this property to Lasater Farms, Inc. and that the net proceeds were used for living expenses and home mortgage payments. His tax returns for 1982 showed rent income from the property to be $87,064.00 and interest expense of $29,893.00. The testimony indicated that a mortgage existed on the property of approximately $405,000.00, although First Commercial did not offer any evidence of the interest rate. The indebtedness was owed to Powell Brothers and was not listed on the financial statement given to First Commercial. The value of the asset was fixed by the debtor at $803,220.00 as of January, 1982. Lasater testified that he purchased the property (three Andy's Restaurants located in North Little Rock, Siloam Springs, and Stuttgart)

for $465,000.00, and after payment of expenses the debtor netted $35,780.44 cash. The debtor did not offer evidence to explain where the money went other than to say that it was used for living expenses.

The deeds show that they were recorded in December, 1982, although the sale is not reported on debtor's 1982 tax returns. The closing statement reflects a date of January 7, 1982, but has a handwritten notation that it should be "1/7/83." The debtor testified that he never listed the property with a realtor, that each property was leased with a triple net lease, and that he had to sell quickly because the property was not a good investment and had a negative cash flow. Lasater also testified that since he purchased the property it has had a negative cash flow.

The debtor testified that he received $7,000.00 per month from Andy's on this property during 1982 and that this all went to pay the mortgage held by the Powell Brothers. The debtor reported on his 1982 tax return total interest expense of $29,893.00 against the property, which is $2,491.08 per month. This indicates a $4,508.92 payment per month on principal. These figures contradict the testimony of both the debtor and Lasater as to the apparent worth of these assets.

VI.

### LIVESTOCK

### ($120,000.00)

The debtor listed $120,000.00 worth of livestock on his financial statement as of January, 1982. The bankruptcy petition listed no livestock, and no transfer of livestock was disclosed on the statement of affairs as having occurred one year prior to the order of relief. Debtor's 1982 tax return lists ownership of three race horses, one acquired in 1980 and the others in 1982, with a total cost basis of $26,875.00. The debtor took $3,359.00 depreciation on these

---

**4.** Testimony did not indicate whether Locke still owned an interest in Collins, Locke & Lasater, Inc. at the time of this transfer.

horses in 1982. The horses were named on his tax returns as Forecast, Singular, and Sindication although Lasater testified that in 1982 he sold a half interest in three race horses to the debtor which were named Fighting Hell, Super Doc, and Petit Jean. Lasater said that one of these horses died and that Locke only made a small downpayment and never paid the balance. Locke testified, however, that he paid $20,000.00 down. Mr. Lasater testified that he repossessed the horses in 1982 and sold them for "very little." He said he was unaware of debtor's ownership in any other horses in 1982. The debtor testified that the horses Lasater repossessed were the horses on the financial statement. No explanation was given by the debtor for the three horses he reported owning on his tax returns, and the debtor does not report any transfer on his tax returns.

## VII.

### AUTOMOBILES

#### ($60,000.00)

On debtor's 1982 financial statement he lists five (5) automobiles worth $60,000.00. His bankruptcy petition simply states he sold his cars for assumption of debt equal to value. The debtor testified that he transferred four (4) vehicles to his ex-wife who took over payments. These were cars which were used by his ex-wife and his children. The fifth car was a Mercedes Benz which had been purchased for $35,000.00 and which was mortgaged to Worthen Bank & Trust Company for $27,000.00. This was sold in 1982 to Dan Lasater's corporation, Lasater Farms, Inc., which paid the mortgage against it and then leased the car to Lasater Investments, Inc. (formerly, Collins, Locke & Lasater), which in turn gave the car to the debtor who currently uses it as his personal vehicle.

The debtor testified that he was unable to make the payments on his ex-wife's and children's cars and that his ex-wife agreed to assume these payments. The former Mrs. Locke testified that the debtor transferred three, not four, vehicles to her and that the fourth one belonged to her and was already in her name. She said that these transfers occurred in 1982. Mrs. Locke testified that she works for a construction company and takes home around $1,000.00 per month. She testified that her house payment is $198.00 per month and that the debtor transferred a Subaru which had a $224.00 per month payment, a Toyota at $236.00 per month, and a Datson 280–Z at $260.00 per month. As of the date of the hearing, one car was paid for, one was not, and one had been traded for a new car. There was no evidence as to value other than the debtor's financial statement. The evidence does indicate the existence of equity, although the debtor's children and ex-wife received it, not the creditors.

## VIII.

### LAKE HOUSE

#### ($88,000.00)

The debtor indicated on his bankruptcy petition that within one year of bankruptcy he sold a lake house near Hot Springs, Arkansas, for $48,000.00, and the proceeds were used for working capital in Locke-McCord Buick, Pontiac, GMC, Inc. (Locke-McCord). The debtor, likewise, testified on direct examination that he sold the lake house for that sum and that the proceeds were used for working capital in Locke-McCord. The rest of the evidence describes a different transaction.

The debtor valued the lake house as of January, 1982 on his financial statement at $88,000.00 and testified that there was an existing mortgage of about $7,000.00. The debtor deeded the property to his son-in-law, Billy McCord, for the assumption of the $7,000.00 debt. Billy McCord testified that he refinanced the property and, in September, 1982, borrowed an additional $32,195.57 and then said he made a capital contribution to Locke-McCord of $32,195.57. Locke-McCord is a corporation in which McCord already owned fifty percent (50%), and McCord testified that this contribution to capital was in his name, not in the name of his father-in-law, George Locke.

The increase in capital contribution is not, however, shown on the corporation's financial statement. McCord testified that he now works for Lasater and that Locke has been in the lake house once or twice since the sale. Billy McCord said that he thinks the property is worth $60,000.00 to $65,000.00. It now has two mortgage liens securing $75,000.00 or $80,000.00 against it. Locke listed this transaction on his tax returns as a sale for $48,500.00, which indicates that he, not McCord, received the sale proceeds. Locke also filed answers to interrogatories with the Court in which he stated that the sale was for cash and that the cash proceeds were paid to First Commercial.

## IX.

## LOT RIVER RIDGE–LITTLE ROCK

### ($110,000.00)

This asset is listed on the debtor's 1982 financial statement at $110,000.00 and was sold in 1982. The debtor did not disclose the sale of the property on his petition nor is it reported on his 1982 tax return. The debtor testified on direct examination that he netted $15,000.00 from the sale of the lot and that he used the money for business and living expenses. On cross examination, however, debtor acknowledged that actually he sold the lot for $114,000.00, paid an indebtedness of approximately $65,000.00 and netted $49,000.00.

## X.

## STOCK IN AUTOS UNLIMITED

### ($55,000.00)

The debtor testified at the hearing that the stock in this corporation was absorbed in the Locke-McCord dealership when it was established, but he didn't remember when. He admitted that he had previously testified at a deposition, however, that the company was simply liquidated in mid-1982 and that he never received any money out of it. This transaction is neither reported on debtor's tax return nor his bankruptcy petition. Locke also admitted in his deposition that he did not know whether there was any indebtedness against this stock or not, and did not offer to further explain what happened to this asset. The debtor's tax return reflects that the debtor received $23,777.00 income from this corporation.

## XI.

## ASHLEY REALTY CO.

### ($4,200.00)

Debtor listed his interest in Ashley Realty Co. at $4,200.00 in January, 1982. Debtor's bankruptcy petition does not reflect that he transferred his ownership, yet on direct examination, he stated he transferred his interest to John Spivey in the summer of 1982; the debtor gave it back to him. However, his response to interrogatories stated that he had not transferred it. Then he stated that he did not remember what he did with it. This asset is not listed as an asset on the debtor's petition.

## XII.

## HOME IN HAMBURG

### ($148,000.00)
### LOTS

### ($22,000.00)

This asset was titled in the debtor's name subject to his ex-wife's right to reside there as long as she wanted, pursuant to a divorce decree rendered prior to the bankruptcy. Debtor valued the home at $148,000.00 in January, 1982, and did not reside there at the time the petition was filed. In 1982, debtor deeded title to the house to his ex-wife, Venda Locke, who simply assumed a relatively small mortgage indebtedness against it of $14,000.00. This deed also conveyed a lot which was adjacent to the house. The debtor first stated that the lot which was so conveyed was the same lot valued on the financial statement at $22,000.00, but later in the trial retracted that testimony. The debtor said he felt compelled to give this property to his ex-wife because he could not afford the up-keep

expense and mortgage payments. This transfer was represented on the petition to be a conveyance to his ex-wife pursuant to the divorce decree but, according to the testimony, no such Order directing a conveyance exists. The transfer of the lot is not shown on the bankruptcy petition. At the debtor's deposition he stated that the $22,000.00 lot was the lot beside his house, but that he just did not know if he sold it or not.

## XIII.

### DEEP SOUTH CONSTRUCTION
### ($750,000.00)

Debtor's stockholder interest in this asset was valued at $750,000.00 in debtor's financial statement. It was sold in 1982 to Benny Ryburn, Sr., who was the owner of Commercial Bank in Monticello which allegedly held a mortgage for $424,000.00. This transaction was not reported on the debtor's bankruptcy petition. The debtor said he did not have documentation of the debt to Mr. Ryburn, but he was sure Mr. Ryburn did. This debt is not shown on debtor's financial statement. The debtor testified previously at a deposition that he probably borrowed from Ryburn $200,000.00 of the $424,000.00 in 1982, but said he had no promissory note evidencing the debt. Debtor reported income of $103,000.00 from Deep South Construction in 1982 on the petition although debtor said that he did not actually receive that much money in 1982. The debtor stated that the income represented advances he had received over the years and that he was required by his accountant to show this as income in 1982. This income is not reported anywhere on debtor's tax return for 1982, and the tax return reports the sale price at $387,000.00, not $440,000.00.

## XIV.

### LOCKE SHOPPING CENTER
### ($166,000.00)

This asset was valued by debtor at $166,000.00. Debtor sold this in the latter part of 1982 to Carl and John Durban for $40,000.00. The debtor first explained that the $40,000.00 went for "living expenses," then said he used the $40,000.00 to pay the Boyd Co. for a study. His petition reflects that he used this money for living expenses. The sale is not reflected on debtor's tax return for 1982.

## XV.

### LOCKE INSURANCE AGENCY
### ($200,000.00)

The debtor listed his interest in the Locke Insurance Agency to be worth $200,000.00 as of January 31, 1982. The bankruptcy petition does not reflect any transfer of this asset. Debtor reports $1,780.00 income in 1982 and does not reflect that this business was sold in 1982. Debtor stated that he sold it in 1982 or early 1983 to Mrs. Jones and Mrs. Lockwood who simply assumed a $100,000.00 debt against it. These ladies were employees of the agency.

## CONCLUSIONS OF LAW

11 U.S.C. § 727(a)(2) provides that the debtor may not be granted a discharge if:

(2) the debtor, with intent to hinder, delay, or defraud a creditor or an officer of the estate charged with custody of property under this title [11 USCS §§ 1 *et seq.*], has transferred, removed, destroyed, mutilated, or concealed, or has permitted to be transferred, removed, destroyed, mutilated, or concealed—

(A) property of the debtor, within one year before the date of the filing of the petition; or ...

The trustee [creditor] has the ultimate burden of proving facts essential to an objection to discharge by a fair preponderance of evidence. *Bankruptcy Rules of Procedure*, Rule 4005; *Matter of Ramos*, 8 B.R. 490 (Bkrtcy.W.D.Wis.1981); *In re Martin*, 698 F.2d 883 (7th Cir.1983); *Matter of Reed*, 700 F.2d 986 (5th Cir.1983); 4 *Collier on Bankruptcy* ¶ 727.14 (15th Ed. 1982). However, once a creditor introduces proof that the debtor committed any of the

prohibited acts, the debtor has the burden of coming forward with evidence to explain his conduct. *Matter of Freedman,* 693 F.2d 50 (8th Cir.1982); *In re Bateman,* 646 F.2d 1220 (8th Cir.1981); *Rules of Bankruptcy Procedure,* Rule 4005, Advisory Committee Note; *In re Martin,* 698 F.2d 883 (7th Cir.1983); *Allis v. Jones,* 403 F.2d 707 (8th Cir.1968). The rule is the same under state law. *Leonhard v. Flood,* 68 Ark. 162, 56 S.W. 781 (1900). Thus, a trier of fact may properly draw a reasonable inference of fraud from an unexplained suspicious transfer. *See, In re Renner,* 45 B.R. 414 (Bkrtcy.D.Md.1984); *In re Martin,* 698 F.2d 883 (7th Cir.1983); *Matter of Kauffman,* 675 F.2d 127 (7th Cir.1981). As the Court states in *In re Martin,* 698 F.2d at 888:

> It is clearly unsatisfactory to grant the debtor a discharge in a case such as this, where the debtor "stonewalls" the creditor and refuses to credibly explain to the court his puzzling and suspect transactions.

■ The intent necessary to deny discharge must be actual, not constructive, but such intent may be proven by other circumstantial evidence, such as the debtor's actions. *In re Gordley,* 38 B.R. 630 (Bkrtcy.S.D.Ohio, W.D.1984); *In re Reed,* 18 B.R. 462 (Bkrtcy.E.D.Tenn.1982); *In re Bernson,* 15 B.R. 100 (Bkrtcy.S.D.Fla. 1981); *In re Rubin,* 12 B.R. 436 (Bkrtcy.S. D.N.Y.1981); *In re Hess,* 21 B.R. 465 (Bkrtcy.W.D.Va.1982); *In re Balch,* 25 B.R. 22 (Bkrtcy.N.D.Tex.1982).

■ Fraudulent intent on the part of the bankrupt may be established by circumstantial evidence or by inferences drawn from a course of conduct. *Farmers Co-Op Association of Talmage, Kansas v. Strunk,* 671 F.2d 391, (10th Cir.1982); *In re Kaiser,* 32 B.R. 701 (D.C.1983); *Matter of Vecchione,* 407 F.Supp. 609 (S.D.N.Y. 1976). Evidence of fraudulent conduct which itself cannot form the basis for denial of discharge nevertheless may be considered on the issue of fraudulent intent. *In re Riddle,* 8 B.R. 797 (Bkrtcy.S.D.Fla. 1980). Fraudulent transactions that occur outside of one year prior to bankruptcy help to solidify the presumption drawn from the conduct in question. While these acts are not grounds for objection to discharge, an inference of a continuing course of fraudulent conduct can be drawn when these acts are combined with those fraudulent acts performed within one year of filing.

■ Intent to defraud creditors is presumed where the debtor, within one year of bankruptcy, gratuitously transfers property. *In re O'Connor,* 32 B.R. 626 (Bkrtcy. E.D.Pa.1983); 4 *Collier on Bankruptcy* ¶ 727.02 (15th Ed.1982). Proof of inadequate consideration is not the only circumstance from which a finding of fraudulent intent may be made. For instance, under state law for a transfer to withstand attack as fraudulent, it must be made both for an adequate consideration and made in good faith. Ark.Stats.Ann. § 68–1302 (Repl. 1979); *Bank of Sun Prairie v. Hovig,* 218 F.Supp. 769 (W.D.Ark.1963); *Sieb's Hatcheries, Inc. v. Lindley,* 111 F.Supp. 705 (W.D.Ark.1953), *aff'd* 209 F.2d 674 (8th Cir. 1954). Where a transfer is only a step in a general plan, the plan must be viewed as a whole with all of its implications and if a clear pattern of purposeful conduct emerges, such conduct will support a finding of actual fraudulent intent. *In re Checkmate Stereo and Electronics, Ltd.,* 9 B.R. 585 (Bkrtcy.E.D.N.Y.1981).

■ Once it is established that a transfer was fraudulent, it is not necessary to establish the precise value of what the estate lost. *See, In re Riddle,* 8 B.R. at 799.

■ The debtor's explanation that a transfer of equity in property to a relative within a year of bankruptcy because the debtor could no longer make payments is not a credible explanation for such action and has been held insufficient to rebut the presumption of a fraudulent intent sufficient to constitute grounds to deny a discharge. *Matter of Laughlin,* 7 B.R. 924 (Bkrtcy.W.D.Mo.1981). *See, also, In re Marcus,* 45 B.R. 338 (S.D.N.Y.1984); *In re Kearny,* 116 F.2d 899 (2nd Cir.1940); *In re*

*Gordley,* 38 B.R. 630 (Bkrtcy.S.D.Ohio, W.D.1984).

The facts here show that most of the transferees or the beneficiaries of the transfer of the property conveyed by George Locke were either the debtor's business partner/employer, the debtor's son-in-law, the debtor's children, the debtor's ex-wife, the debtor's former business associates, or the debtor himself. The debtor misdescribed, or omitted entirely, many of the significant transactions from his petition as well as his tax returns. He gave contradictory testimony at the trial when compared to his pre-trial deposition. The debtor's financial statement given to First Commercial was false. The debtor made sure that creditors did not receive any of the equity in his assets; he either gave it away or it simply disappeared. The debtor's transactions with Mr. Lasater are of particular concern, especially in connection with the Locke-McCord transaction. The debtor testified in a deposition that he did not owe Lasater any large sums in 1983, yet in early 1983 Lasater supposedly received over $170,000.00 as repayment of a debt owed by George Locke. This indebtedness was first represented to be an indebtedness of the debtor, but later testimony was that the debt was actually the debt of Locke-McCord Buick, Pontiac, GMC, Inc. Neither Lasater nor the debtor offered any written evidence of the validity of this indebtedness, and the Court simply does not believe that no such record exists, if the debt is, in fact, genuine. The only written evidence was the balance sheet of the corporation which indicates no debt in this amount was owing to Lasater in September, 1982. It makes no difference whether the debt was fictitious or a debt of the corporation, still the payment would be fraudulent as to creditors of Locke. *In re Harry Kaiser Associates, Inc.,* 14 B.R. 107 (Bkrtcy.S.D.Fla.1981); *Matter of Beechwood Medicenter of Flint,* 23 B.R. 939 (Bkrtcy.E.D.Mich., S.D.1982).

Likewise, and of equal concern, is the transaction between the debtor and his son-in-law, Billy McCord, regarding the lake house. The debtor falsely described the transaction first on his petition then in his answers to interrogatories, and the evidence suggests that the debtor is not testifying truthfully concerning where the $32,-195.57 which was borrowed against the property went. The fact that the debtor showed a purchase price of $38,000.00 on his tax return, which resulted in a capital gain, is strong evidence against McCord's testimony that he put the $32,195.57 into Locke-McCord as an additional capital contribution in his name. If the money had been deposited in Locke-McCord to the account of McCord, as he testified, it could have been easily proven by bringing forward records of the transaction which necessarily exist. No such records were offered.

Although well within his power to do so, the debtor chose to obfuscate all of his various transactions rather than bring records to explain them. The Court considers this failure to explain to be additional evidence of fraudulent intent.

The statutory scheme for the honest debtor in Chapter 7 is simple; he surrenders his non-exempt assets to the trustee and, in return, he receives a discharge of his debts and a fresh start. His creditors are entitled to share ratably in whatever equity exists according to the priorities set by law. When a debtor behaves as this one has, he simply does not deserve a discharge. All of the evidence here points to dishonesty. The information that the debtor gave regarding his assets was confusing, contradictory, and calculated to deceive.

The comments of the court in *In re Checkmate Stereo and Electronics, Ltd.,* 9 B.R. at 615, 616, are applicable here.

> There is no other explanation for what occurred here than that Wren decided when Audiovox began pressing him for repayment of the enormous debt it owed that he would salvage for his own use what these debtors had which was of value, and leave Audiovox and the creditors the stripped corporate carcasses...

Wren's denial of fraudulent intent is wholly inadequate to overcome the clear and overwhelming evidence pointing to such intent as the only reasonable explanation of what happened here.

The evidence, when considered as a whole, is clear and convincing that as a part of a larger scheme to defraud, the debtor, George Locke, within one year of the order of relief, conveyed with the actual intent to hinder, delay, and defraud creditors, the following property:

A. Locke Shopping Center
B. Kroger building
C. Commercial real estate
D. Home in Hamburg
E. Lake house

The discharge is denied.